**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| HARLEY V. FRANCO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2020-0608-MTZ |
| | ) | |
| AVALON FREIGHT SERVICES LLC | ) | |
| AND DOUG HOUGHTON, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

WHEREAS, on review of Defendants' motion to dismiss (the "Motion to Dismiss") and Plaintiff's cross-motion for summary judgment (the "Motion for Summary Judgment"), as briefed and taken under advisement on November 10, 2020, it appears:[1]

A.    Avalon Freight Services LLC ("Avalon") is a maritime freight transportation services provider that primarily operates in California.[2]  Avalon has a single member, GH Channel Holding LLC ("Holding").[3]  Holding is governed by an LLC agreement dated March 26, 2014 (the "Holding LLC Agreement").[4]

---

[1] For the purposes of the pending motions, I draw all relevant facts from the Verified Complaint.  *See* Docket Item ("D.I.") 1 [hereinafter "Compl."].

[2] *Id.* ¶ 5.

[3] *Id.* ¶ 11.

[4] *See* Compl. Ex. B [hereinafter "Holding LLC Agreement"].

Holding's ownership and control are evenly distributed between plaintiff Harley Franco and his nonparty affiliates on the one hand, and nonparty Greg Bombard and his nonparty affiliates on the other.[5] Franco and Bombard are the two sole members of Holding's board of directors.[6] Thus, Franco and Bombard have equal control over Avalon's sole member, Holding.

      B.     Franco and Bombard also endeavored to equally control Avalon itself. Avalon is governed by an LLC agreement dated March 25, 2014 (the "Avalon LLC Agreement").[7] Under Section 3.1 of the Avalon LLC Agreement, Avalon is managed by a board of five directors (the "Avalon Board"): two aligned with Franco, two aligned with Bombard, and one tiebreaker director.

---

[5] *See id.* §§ 3.2(a)–(b), 4.1; *see also* Compl. ¶ 12.  It appears that Franco owns his interest in Holding through a trust.  *See* Compl. ¶ 12.  No party disputes Franco's ownership or his standing to bring this action.

[6] *See* Holding LLC Agreement § 4.1.

[7] Compl. Ex. A. [hereinafter "Avalon LLC Agreement"].

> Subject to the provisions of the Act and any limitations in the Certificate of Formation and this Agreement as to the action required to be authorized or approved by the Member, the business and affairs of the Company shall be managed and all of its powers shall be exercised by or under the direction of the board of directors of the 3 Company (the "Board"). The Board shall have five (5) directors. Two of the directors shall be Greg Bombard ("Bombard") and Harley V. Franco ("Franco"). Bombard shall be entitled to designate and elect one additional Board member, who shall initially be Timothy A. Bombard. Franco shall be entitled to designate and elect one additional Board member, who shall initially be Richard J. Padden. The fifth (5th) director shall be mutually agreed upon and appointed by Bombard and Franco, who shall initially be Doug Houghton. Any vacancy in a Board seat may be filled only by the vote or action of the director entitled to designate and elect such seat.[8]

The Avalon LLC Agreement is silent on the removal of board members, including Houghton.[9]

C.     It appears that Holding and Avalon are both deadlocked.[10] The nature of the underlying dispute is neither known to the Court nor relevant to this case, which is limited to the terms of Houghton's continued service. Franco and Bombard disagree as to whether Houghton should remain on the Avalon Board. Franco "does not agree that Houghton should continue to serve" in that role;[11] Bombard wants Houghton to retain his position.[12]

---

[8] *Id.* § 3.1.

[9] *See* Compl. ¶ 2.

[10] *Id.* ¶ 22.

[11] *Id.* ¶ 21.

[12] *Id.* ¶ 20.

D.    Franco filed this action under 6 *Del. C.* § 18-110 and 6 *Del. C.* § 18-111, seeking a declaration that his present dissatisfaction with Houghton means Houghton's "position must be vacated and Franco and Bombard must mutually agree on a new person to fill the position."[13]  Franco interprets Section 3.1's requirement that the fifth director "be mutually agreed upon and appointed by Bombard and Franco"[14] to mean that if Franco no longer agrees to Houghton's continued service, Houghton must be removed from the board.

E.    In response, Houghton and Avalon (together, "Defendants") moved to dismiss the complaint for failure to state a claim.[15]  Defendants read Section 3.1 as addressing only Houghton's initial appointment and the procedure for filling his seat if it becomes vacant.  Defendants argue that neither Franco nor Bombard may unilaterally remove Houghton from the Avalon Board, and so, Franco's complaint must be dismissed.

F.    Franco cross-moved for summary judgment.[16]  The parties' competing motions present a narrow question of contract interpretation:  does Section 3.1 empower Franco to unilaterally remove Houghton from the Avalon Board?

---

[13] *Id.* ¶ 26.

[14] Avalon LLC Agreement § 3.1.

[15] D.I. 8.

[16] D.I. 10.

G.     In reviewing a motion to dismiss,

> (i) [A]ll well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[17]

The summary judgment standard is similarly familiar:

> Summary judgment is appropriate when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  On a motion for summary judgment, "[t]he moving party bears the burden of establishing that there are no issues of material fact, and the court must review all evidence in the light most favorable to the non-moving party."[18]

The proper interpretation of a contract is a question of law, making it well-suited for resolution on a motion to dismiss or a motion for summary judgment.[19]

---

[17] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (quoting *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 227 (Del. 1982)).

[18] *Weil v. VEREIT Operating P'ship, L.P.*, 2018 WL 834428, at *3 (Del. Ch. Feb. 13, 2018) (internal citations omitted).

[19] *See Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006) ("Under Delaware law, the proper interpretation of language in a contract is a question of law.  Accordingly, a motion to dismiss is a proper framework for determining the meaning of contract language."); *see also Lillis v. AT & T Corp.*, 904 A.2d 325, 329–30 (Del. Ch. 2006) ("[J]udgment on the pleadings . . . is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact. . . . If the contract's meaning is unambiguous, [and that meaning supports the movant's claim or defense], the court must grant judgment on the pleadings in favor of the moving party." (internal quotation marks omitted)).

I.	Delaware LLCs are creatures of contract.[20] "In governance disputes among constituencies in an LLC, the starting (and end) point almost always is the parties' bargained-for operating agreement, and the court's role in these disputes is to 'interpret [the] contract [and] effectuate the parties' intent.'"[21] In interpreting LLC agreements, Delaware courts treat them as any other contract,[22] aiming to "give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[23] "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party."[24] In doing so, the Court will "give effect to the plain-meaning of the

---

[20] E.g., *TravelCenters of Am., LLC v. Brog*, 2008 WL 1746987, at *1 (Del. Ch. Apr. 3, 2008).

[21] *A & J Cap., Inc. v. L. Office of Krug*, 2018 WL 3471562, at *5 (Del. Ch. July 18, 2018) (alterations in original) (quoting *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *7 (Del. Ch. June 21, 2012)).

[22] *See Mickman v. Am. Int'l Processing, L.L.C.*, 2009 WL 2244608, at *2 (Del. Ch. July 28, 2009).

[23] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (internal quotation marks omitted) (quoting *GMG Cap. Inv., LLC. v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[24] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (footnotes and internal quotation marks omitted) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del.Ch. Apr. 29, 2005)).

contract's terms and provisions,"[25] will "read a contract as a whole and . . . will give each provision and term effect, so as not to render any part of the contract mere surplusage."[26] Delaware courts strictly construe contract language, especially when, as here, it was negotiated by sophisticated parties, or parties with sophisticated counsel.[27]

**IT IS HEREBY ORDERED**, this 8th day of December, 2020, that:

1.    The parties' disagreement hinges on their competing interpretations of the phrase "The fifth (5th) director shall be mutually agreed upon and appointed by Bombard and Franco, who shall initially be Doug Houghton."[28]  I interpret Section 3.1 as Defendants do.  Section 3.1 does not empower Franco or Bombard to unilaterally remove Houghton from the Avalon Board.

2.    Section 3.1 addresses appointing members of the Avalon Board, not removing them.  Its plain language provides for appointment at two junctures: (1) the appointment of the initial board, and (2) appointment if a vacancy arises.

---

[25] *Id.* at 1159–60; *see also Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) ("Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning.").

[26] *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010).

[27] *See W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007) ("The presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are sophisticated entities that have engaged in arms-length negotiations."), *aff'd*, 985 A.2d 931 (Del. 2009).

[28] Avalon LLC Agreement § 3.1.

7

Section 3.1's plain language compels Franco and Bombard to agree only upon Houghton's initial appointment or upon his replacement if his seat is vacated. Both "agreed" and "appointed" are in the past tense, indicating that Houghton's appointment, and the factions' agreement to that appointment, are one-time events. This interpretation does not render "agreed" or "appointed" redundant, as Franco argues. Section 3.1's "agreed upon and appointed" language is consistent with and parallel to its language permitting each faction "to *designate and elect* one additional Board member": the first verb identifies the director, and the second verb places him on the board.[29] And any redundancy in "agreed upon and appointed" is preferable to reading in meaning the drafters did not intend.[30]

    3.    Section 3.1's language does not require that Franco and Bombard continue to agree, nor does it provide any mechanism by which they should or could periodically evaluate their agreement. Certainly, Franco and Bombard could have drafted it that way, by requiring that "the fifth director shall be mutually agreed upon *at all times*" or by providing that they must "*continue to* mutually agree" on Houghton's appointment. Franco's construction improperly reads in this absent

---

[29] *See id.* (emphasis added).

[30] *See, e.g.*, *In re IAC/InterActive Corp.*, 948 A.2d 471, 498 & n.109 (Del. Ch. 2008).

8

language and introduces a new agreement requirement and removal right to the Avalon LLC Agreement.[31]

4. Section 3.1, like the rest of the Avalon LLC Agreement, is silent on the topic of how to remove a director.[32] Franco argues that to harmonize the agreement and fill this silence, Section 3.1 should be interpreted to provide for a removal process. But there is no need to torture Section 3.1's language to create a removal provision. The Delaware LLC Act clearly addresses how to handle gaps in LLC agreements: by using the default provisions of the Act and, where one does not exist, by making analogies to "law and equity" as appropriate.[33] The Avalon LLC

---

[31] *See DG BF, LLC v. Ray*, 2020 WL 3867123, at *4 (Del. Ch. July 9, 2020) ("When this Court has found the language of a contract clear and unambiguous, it has refused to expand the contract's scope to include rights not expressly granted.").

[32] *See generally* Avalon LLC Agreement.

[33] *See* 6 *Del. C.* § 18-1104 ("In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern."); *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999) ("The basic approach of the Delaware Act is to provide members with broad discretion in drafting the Agreement and to furnish default provisions when the members' agreement is silent."); *Godden v. Franco*, 2018 WL 3998431, at *7 (Del. Ch. Aug. 21, 2018) ("The first step when analyzing a case involving the internal affairs of an LLC is therefore to examine the LLC agreement to determine whether it addresses the issue. If it does, then the contract controls, unless the provision violates one of the exceedingly few mandatory provisions in the LLC Act. If the LLC agreement is silent, then the next step is to look to the LLC Act to see if one of its default provisions applies. If neither source addresses the matter, then the LLC Act instructs that the rules of law and equity . . . shall govern." (footnotes and internal quotation marks omitted)); *see also Obeid v. Hogan*, 2016 WL 3356851, at *6 (Del. Ch. June 10, 2016) ("Using the contractual freedom that the LLC Act bestows, the drafters of an LLC agreement can create an LLC with bespoke governance features or design an LLC that mimics the governance features of another familiar type of entity. The choices that the drafters make have consequences.").

Agreement's silence on director removal does not support or compel interpreting Section 3.1 to allow Franco to remove Houghton upon becoming dissatisfied with his service.

5. Franco contends that permitting Houghton to continue to serve even if he has displeased one faction would disturb the balance of power between Franco and Bombard, and allow one side to take control of the company by "endearing himself to Houghton."[34] But Franco's position creates the reciprocal problem, as it would force Houghton to bend to the will of the side threatening to remove him. Reading in an unlimited and unilateral removal power would cause the exact problem Franco fears: a fifth director who is beholden to one side. Preventing one side from unilaterally removing Houghton does not undermine his independence, but rather, protects it.

6. Interpreting Section 3.1 to require the appointers to agree on Houghton's service only at the time of his appointment squares with the practical function of his tiebreaker role. Sophisticated parties who co-own a company in which ownership is closely tethered to control often include tiebreaker provisions as an *ex ante* dispute resolution mechanism, to prevent deadlock which may lead to

---

The broader question of how Houghton may be properly removed is not currently before the Court.

[34] D.I. 18 at 4.

10

dissolution.[35]  In one such mechanism, the owners have equal voices on the board, and give a swing vote to a third-party tiebreaker director.[36]  In the event of deadlock, the tiebreaker director can consider the company's best interests without being beholden to either side, constrained by fiduciary duties but free of the owners' competing interests.  The presence of a tiebreaker director may also inspire the owners to manage their investment through cooperation and compromise, without resorting to the tiebreaker.[37]

---

[35] *See* Brian J. Broughman, *The Role of Independent Directors in Startup Firms*, 2010 Utah L. Rev. 461, 462 (2010) ("[P]rivately held startup firms frequently include independent directors on their boards, often in key tie-breaking positions.  Firms financed by venture capital (VC) allocate one-quarter of their board seats to independent directors.  More than half of the time, the entrepreneur and VC investors (the VCs) share control of the board with an independent director holding the tie-breaking vote.").

[36] *See id.* at 464 ("Adding an independent director to the board allows a new alternative: control of the board can be shared with an independent director acting as the tie-breaking vote.  To illustrate, consider a board with three directors: an entrepreneur, a VC, and an independent director.  I refer to this arrangement as 'ID-arbitration' to emphasize the independent director's position as a quasi-arbitrator.  The independent director can settle disputes that may arise between the entrepreneur and VC.  ID-arbitration avoids deadlock without leaving the entrepreneur or the VC vulnerable to unilateral actions by a controlling party.").

[37] *See id.* ("More importantly, the presence of an independent director may prevent conflicts from ever materializing. . . . The independent director does not need to 'arbitrate' actual conflicts, but rather, primarily serves as a commitment mechanism that forces the [investors] to compromise."); *see also id*. at 475 (describing unilateral control by only one faction of investors as "susceptible to opportunistic behavior" in the absence of an independent director.).  Franco contends that under his more volatile framing of the tiebreaker director, the nuclear option of dissolution will still inspire collaboration out of fear of mutually assured destruction.  *See* D.I. 18 at 4; D.I. 14 at 11.  I agree with Professor Broughman's theory that an independent director with meaningful and durable decision-making power better encourages compromise between owners who are also decisionmakers.  *See* Broughman, *supra* note 35, at 475.

7.  Unilateral removal of the tiebreaker would undermine that director's neutrality and disincentivize cooperation. If one party could remove the tiebreaker at any time and without restriction, any particular tiebreaker would not stay in office for long, and substantive disagreements would swell into the removal of the tiebreaker and selection of a new one, without resolution of the underlying dispute. Rather than subjecting themselves to endless control battles, potentially leading to dissolution, Franco and Bombard instead mutually decided to select Houghton to settle their disputes. Section 3.1 compels adherence to that choice unless and until Houghton's seat is vacant.[38]

8.  When the waters were clear, Franco and Bombard agreed that Houghton would steer the ship if they disagreed over which way it ought to turn. This agreement sensibly minimized the possibility of the ship becoming rudderless, susceptible to sinking into dissolution. Now that Franco and Bombard are apparently fighting over the wheel, Franco cannot unilaterally remove the tiebreaker. Allowing him to do so would rewrite his agreement with Bombard, undermine their chosen governance structure, and expose Avalon to the deadlock its LLC agreement attempts to avoid.

---

[38] To be clear, I do not intend to imply that Houghton must remain on Avalon's board in perpetuity. While the Avalon LLC Agreement is silent on how to remove a director, Delaware's LLC Act and, in certain limited circumstances, our common law, provide default provisions to fill the gap. *See supra* note 33 and accompanying text.

9. For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. Accordingly, and for the same reasons, Franco's Motion for Summary Judgment is DENIED.

*/s/ Morgan T. Zurn*

Vice Chancellor Morgan T. Zurn
