# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| IP NETWORK SOLUTIONS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. N21C-04-014 PRW CCLD |
| | ) |
| NUTANIX, INC., | ) |
| | ) |
| Defendant. | ) |

Submitted: January 11, 2022
Decided:  February 8, 2022

## MEMORANDUM OPINION AND ORDER

*Upon Nutanix's Motion for Partial Judgment on the Pleadings,*
**DENIED**

*Upon IP Network Solutions' Motion for Partial Judgment on the Pleadings,*
**DENIED**

Nicholas T. Verna, Esquire, WOMBLE BOND DICKINSON LLP, Wilmington, Delaware, *Counsel for Plaintiff IP Network Solutions, Inc.*

Justin M. Forcier, Esquire, Brian M. Rostocki, Esquire, REED SMITH LLP, Wilmington, Delaware, *Counsel for Defendant Nutanix, Inc.*

**WALLACE, J.**

Plaintiff IP Network Solutions, Inc. and Defendant Nutanix, Inc. executed a Master Services Agreement in October 2019. But, unfortunately, their business then relationship quickly unraveled. Each party comes here bringing claims alleging that the other breached its obligations under the MSA, and each has moved for partial judgment on the pleadings. Their dueling motions pose two core questions. First, did IP Network Solutions materially breach the MSA by hiring employees who were not "exclusively dedicated" to providing Nutanix-related services? And second, did Nutanix effectively terminate the MSA even though its notice of termination did not strictly comply with the MSA's notice procedures?

Unresolved factual disputes require that both motions be **DENIED**.

## I. FACTUAL BACKGROUND

### A. THE PARTIES

Plaintiff IP Network Solutions, Inc. ("IPNS" or "Service Provider") is a Delaware corporation with its principal place of business in Herndon, Virginia.[1] IPNS works exclusively with the United States federal government and provides various government agencies with cloud-based services.[2] Defendant Nutanix, Inc. ("Nutanix") is a Delaware corporation with its principal place of business in San

---

[1] Compl. ¶ 4, Apr. 5, 2021 (D.I. 1).

[2] *Id.*

Jose, California.[3] Nutanix provides enterprise cloud-based platforms that combine storage, computing, and virtualization technologies.[4]

## B. THE MASTER SERVICES AGREEMENT

Around April 2019, Nutanix decided to contract with an established IT company holding certain security clearances in the hope of building its own business relationship with the federal government.[5] Nutanix solicited several bids and ultimately entered into contract negotiations with IPNS.[6] The parties executed the Master Services Agreement ("MSA") on October 7, 2019.[7]

Under the MSA, IPNS was to provide "professional services and related work on behalf of Nutanix in connection with the sale of Nutanix products and services to U.S. Federal Government end-customers."[8] The parties agreed IPNS would be the "exclusive third-party provider of all Nutanix-related services to U.S. government end-users under contracts where any level of facility security clearance is required

---

[3]   *Id.* ¶ 5.

[4]   IPNS's Answering Br. in Opp'n to Nutanix's Mot. for Partial J. on the Pleadings, 3.

[5]   Nutanix's Answer, Affirm. Defenses, and CounterCl., 28; *see also* IPNS Ans. and Affirm. Defenses to CounterCl., Resp. No. 7.

[6]   Nutanix's Answer, Affirm. Defenses, and CounterCl., 28; *see also* IPNS Answer and Affirm. Defenses to CounterCl., Resp. No.8.

[7]   Nutanix's Answer, Affirm. Defenses, and CounterCl., 28; *see also* IPNS Opening Br. in Supp. of its Mot. for Partial J. on the Pleadings, Ex. A, Nutanix Master Services Agreement ("MSA") (D.I. 20).

[8]   MSA § 1.7; s*ee also* Compl. ¶ 1.

to perform such professional services."[9]  The current dispute relates to several specific MSA provisions detailed below.

## 1. *Section 2: Provision of Service; Headcount Requirements; Performance Standards; Training*

Under Section 2.1, any Nutanix-related services were to be provided by full-time IPNS employees who "(i) have an active and appropriate level personnel security clearance from the United States government, and (ii) are exclusively dedicated to the provision of services defined in the MSA and its related SOWs."[10] Section 2.1 also required IPNS to set up a "Siloed Division" in its accounting department that would allow it to separately track and account for the work performed by the Nutanix-designated required personnel.[11]  Accordingly, Section 2.2 required IPNS to hire five full-time employees, *i.e.*, "Required Heads," to provide the Nutanix-only services.[12]  Those positions were: "(i) one Assistant Facility Security Officer ('Assistant FSO'); (ii) one Bid Desk Manager ('BDM'); (iii) two Advisory Service Architects (each, an 'Architect'); and one Sr. Proposal

---

[9]  *Id.* ¶ 21; *see also* MSA § 5.

[10]  Compl. ¶ 15 (emphasis added); *see also* MSA § 2.1.  An "SOW" is defined in the MSA as a "statement of work," and "means a mutually-executed written description of the Services . . . including any work product or deliverables to be provided in connection with the Services . . . between Nutanix and Service Provider."  MSA § 1.8.

[11]  Compl. ¶ 16.

[12]  *Id.* ¶ 17; *see also* MSA § 2.2.

Writer."[13]  Finally, Section 2.4 required IPNS to ensure that "all Assigned Personnel and Approved Subcontractors[] compl[ied] with Nutanix's Code of Business Conduct and Ethics."[14]

## 2. *Section 3: Nutanix Investment; Investment Clawback; Set Off Rights*

Section 3.1 required Nutanix to pay IPNS a total of $1.5 million in four installments, *i.e.*, "Payment Milestones," to help fund both the Siloed Division and the Required Heads.[15]  First, Nutanix was to pay a $500,000 "Initial Payment" by January 2, 2020.  Second, Nutanix was to pay a $300,000 "FSO Payment" within ten business days of the Assistant FSO commencing employment with IPNS (the "FSO Milestone").  Third, Nutanix was to pay a $200,000 "Target A Payment" within ten business days of both the BDM and at least one Architect commencing employment with IPNS.  Fourth, Nutanix was to pay a $500,000 "Target B Payment" within ten business days of each of the remaining Required Heads commencing employment with IPNS.

If any of these milestones weren't achieved, the MSA provided for

---

[13]  *Id.*

[14]  MSA § 2.4.  In its Answer, Nutanix cites language from its website that prohibits the performance of "any services as a director, employee, agent or contractor for a customer, a supplier or any other entity without express written approval from Nutanix's Legal department" unless performed by a non-employee director of Nutanix. *See* Nutanix's Answer, Affirm. Defenses, and CounterCl., 31.

[15]  Compl. ¶ 18; *see also* MSA § 3.1.

irreversible "Clawback Payments."[16]  Specifically: (1) if the FSO milestone wasn't achieved by the three-month anniversary of the Effective Date, the $300,000 FSO Payment would be forfeited and IPNS would have no future right to that payment; (ii) if the Target A milestone wasn't achieved by the twelve-month anniversary of the Effective Date, the $200,000 Target A Payment would be forfeited and IPNS would have no future right to that payment; and (iii) if the Target B milestone wasn't achieved by the fifteen-month anniversary of the Effective Date, the $500,000 Target B Payment would be forfeited with IPNS having no future rights to that payment.[17]

Finally, Section 3.3 provided that if a Clawback Payment is triggered but is not timely paid to Nutanix, then Nutanix "shall have the right, but not the obligation, to retain, set-off and deduct the full amount of the applicable Clawback Payment(s) from any other amounts owed to Service Provider."[18]

3.  *Section 6: Minimum Annual Bookings Commitment*

Section 6.1 defined "Bookings" to mean the "aggregate USD value of all fees for Services set forth in [the Statements of Work] executed during [a] Measurement

---

[16]   MSA § 3.2.

[17]   *Id.*

[18]   MSA § 3.3.

Period," as calculated either on a fixed-fee or a time-and-materials basis.[19]  In turn, "Measurement Period" referred to five intervals of one year each, starting on the Effective Date of October 7, 2019, and concluding on September 30, 2024.

Under Section 6.2, Nutanix agreed to pay IPNS $1.5 million in Bookings during each Measurement Period.[20]  At the end of each Measurement Period, Nutanix was to provide IPNS with a written notice "setting forth Nutanix's good faith calculation of the Bookings with respect to such Measurement Period."[21]

Section 6.4 governed "Shortfall Payments" with respect to Bookings made within a Measurement Period.[22]  Under this provision, if the Actual Bookings are less than the Annual Bookings Commitment, then one of three scenarios set forth more fully in the MSA would govern.  As relevant here, Section 6.4 meant any shortfall regarding the Annual Bookings Commitment for the first Measurement Period ending September 30, 2020, "rolls over" to the second Measurement Period ending September 30, 2021.[23]

---

[19]  MSA § 6.1.

[20]  MSA § 6.2.

[21]  MSA § 6.2.

[22]  MSA § 6.4.

[23]  *See* Compl. ¶ 30; MSA § 6.4.

## 4. *Section 16: Term and Termination*

Section 16 governs the Agreement's term and the procedures for an early termination.[24] A main point of contention here is Section 16.4, which governs termination for cause.[25] The relevant sections read as follows:

> By Nutanix. Nutanix will be entitled to terminate this Agreement immediately and for cause if: (i) Service provider . . . materially breaches any representation, warranty, covenant or agreement set forth in this Agreement . . . or any [Statement of Work] and such breach has not been cured within ten (10) business days after Nutanix provides Service Provider written notice thereof; *provided, however*, that no cure period shall be required for a breach which by its nature cannot be cured; (ii) Service Provider fails to achieve the FSO Milestone on or prior to the day that is the three (3) month anniversary of the Effective Date; (iii) Service Provider fails to maintain, or any U.S. governmental agency or regulatory body takes any action in an effort to revoke or invalidate, Service Provider's facility security clearance; or (iv) Service Provider consummates an Acquisition Proposal with any person or entity other than Nutanix or one of its Affiliates.
>
> &ast; &ast; &ast;
>
> Effect of Termination for Cause. Upon any termination of this Agreement pursuant to this Section 16.4 (i) by Nutanix, then this Agreement and all [Statements of Work] will terminate and Nutanix will have no further obligations or liabilities to Service Provider . . . or (ii) by Service Provider, then (x) with respect to any [Statements of Work] that are outstanding as of the termination date, to the extent not already paid Nutanix will, as soon as practicable, pay Service Provider for the Services actually completed as of the termination date, provided that Service Provider has delivered to Nutanix or its applicable end customer the portion of the Services completed, (y) Service

---

[24] MSA § 16.

[25] MSA § 16.4.

Provider will pay Nutanix the other amounts, if any, that Service Provider owes Nutanix under the terms of this Agreement as of the termination date, and (z) except as set forth in the foregoing clause, this Agreement and all [Statements of Work] will terminate as of the termination date and neither party will have any further obligations or liabilities to the other party; *provided, however,* that the Surviving Provisions shall survive any termination under this Section 16.4.[26]

The parties disagree about the procedures Nutanix must follow before it may terminate the MSA for cause under Section 16.4. According to Nutanix, Section 16.4 doesn't require it to provide any notice to IPNS before terminating the MSA if IPNS fails to achieve the FSO Milestone or if IPNS commits a material breach that "by its nature cannot be cured."[27] While IPNS insists that any termination for cause must comply strictly with the notice procedures detailed in Section 17 of the MSA.[28]

### 5. *Section 17: General Provisions*

Section 17.8 governs "Notices" between the parties. It provides that "[a]ny notice, demand, request, or other communication required or permitted to be given under [the MSA] will be made in writing and will be delivered either (i) by personal delivery . . . (ii) by overnight courier . . . (iii) by certified registered mail, return receipt requested . . . or (iv) by both facsimile and electronic mail (with notice

---

[26] MSA § 16.4 (emphasis in original).

[27] Nutanix's Answer, Affirm. Defenses, and CounterCl., 37 n.4.

[28] Compl. ¶ 34.

deemed given upon confirmation of receipt)."[29]

## C. THE PARTIES' GRIEVANCES

The MSA became effective on October 7, 2019, and was intended to remain in effect until September 30, 2024. But things didn't go as planned and Nutanix attempted to terminate the MSA in December 2020. What went wrong? That depends on whom one asks. So, the Court here recounts each side's story separately.

### 1. *Nutanix's Version of Events*

Around December 2, 2019, IPNS informed Nutanix that it had hired Samuel Penaloza as the Assistant FSO.[30] Nutanix paid IPNS the $500,000 Initial Payment and the $300,000 FSO Payment in mid-February 2020, relying on IPNS's representation that it had hired an Assistant FSO.[31] At the time, Nutanix was unaware Mr. Penaloza concurrently occupied a human resources role at IPNS.[32] Nutanix claims this arrangement breached Section 2.1's requirement that any Nutanix-related services be provided an IPNS employee who is "exclusively dedicated" to the provision of MSA-defined services.[33]

---

[29]  MSA § 17.8.

[30]  Nutanix's Answer, Affirm. Defenses, and CounterCl., 34.

[31]  *Id.*

[32]  *Id.*

[33]  *Id.*

Similarly, IPNS informed Nutanix it hired Laks Prabhala as BDM and Alex Quach and Samul Byrd as Architects, which meant IPNS was entitled to the $200,000 Target A Payment.[34] Nutanix made the payment in reliance on IPNS's representations.[35] Now, Nutanix claims IPNS breached the MSA by hiring Mr. Prabhala as BDM because he was concurrently employed as IPNS's Chief Technology Officer.[36]

Nutanix claims most of the Required Heads subsequently ceased their employment at IPNS, with only Mr. Prabhala still providing services under the MSA by the latter half of 2020.[37] Nutanix's attempts to work out a solution with IPNS were unsuccessful.[38] On December 15, 2020, counsel for Nutanix emailed a notice of termination to IPNS's CEO.[39] Nutanix cited the cause for termination as IPNS's "(i) failure to properly (and timely) hire and retain the Required Heads in breach of Sections 2.1, 2.2 and 2.4 (as well as Nutanix's Code of Business Conduct and Ethics), (ii) failure to achieve the FSO Milestone, and (iii) attempts to mislead

---

[34] *Id.* at 34–35.

[35] *Id.*

[36] *Id.*

[37] *Id.* at 35.

[38] *Id.* at 35–36.

[39] *Id.* at 37.

Nutanix about its progress and entitlement to the Milestones."[40]  Nutanix also insisted that it was entitled to the Clawback Payments under Section 3.2.  IPNS has since refused to remit even one Clawback Payment.[41]

### 2. *IPNS's Version of Events*

In IPNS's account, it complied with its obligations under MSA Section 2 by hiring each of the Required Heads.  As a result, IPNS claims it was entitled not only to the Milestone Payments that Nutanix has already paid, but also to the $500,000 Target B Payment that Nutanix has refused to pay. [42]  IPNS acknowledges that Mr. Penaoza performed some "human resources work for IPNS" but denies such work breached the MSA "because there were no tasks for the Assistant FSO to perform under the MSA when [he] performed human resources work."[43]  Similarly, IPNS maintains that Mr. Prabhala's non-Nutanix work did not breach the MSA because he performed it only when there was no MSA work to perform.[44]  IPNS acknowledges that some Required Heads have since left IPNS, but denies that

---

[40]  *Id.* at 37.

[41]  *Id.*

[42]  *See* Compl. ¶¶ 19, 36; *see also* IPNS's Answer to CounterCl. at 8 (D.I. 9).

[43]  *See* IPNS's Answer to CounterCl. at 9.

[44]  *See id.* at 10–11.

constitutes a breach.[45]

IPNS claims Nutanix is the party that breached its exclusivity obligations, not IPNS. Specifically, IPNS claims Nutanix hired a third-party provider named Corey Ogeltree and other unspecified firms to provide services the MSA entrusted exclusively to IPNS.[46] IPNS adds that Nutanix recorded only $106,473 in Actual Bookings during the first Measurement period, well short of Nutanix's Annual Bookings Commitment of $1,500,000.[47] IPNS claims the deficit has rolled over to the second Measurement Period, such that Nutanix's Revised Annual Bookings Commitment for the second Measurement Period is now $2,893,527.[48]

IPNS acknowledges Nutanix attempted to terminate the MSA by email on December 15, 2020, but says that its CEO never received the email.[49] Moreover, IPNS insists that Nutanix had no grounds to terminate the MSA for cause, and even if it did, Nutanix's attempt was ineffectual because it did not provide notice "by both facsimile and electronic mail."[50] IPNS says Nutanix's attempt to terminate the MSA

---

[45] *See id.*

[46] Compl. ¶¶ 22–25.

[47] *Id.* at ¶ 30.

[48] *Id.*

[49] IPNS's Answer to CounterCl. at 14.

[50] *Id.*; *see also* Compl. ¶¶ 34–37.

was simply a "transparent attempt to avoid the obligations incurred by Nutanix under the MSA, which Nutanix unsuccessfully sought to renegotiate a few weeks prior."[51]

## D. THIS LITIGATION

IPNS's Complaint has three causes of action. Count I alleges Nutanix breached the MSA by failing to make the $500,000 Target B Payment due under Section 3.1.[52] Count II alleges Nutanix breached its exclusivity obligations under Section 5.[53] And Count III seeks a declaration that (1) IPNS has not materially breached the MSA; (2) Nutanix has no grounds upon which it may terminate the MSA; and (3) Nutanix's prior attempts to terminate the MSA failed to comply with Section 17.8 and lacked any legal effect.[54]

Nutanix answered with two counterclaims and a host of affirmative defenses. Counterclaim Count I alleges IPNS failed to hire and retain full-time employees— specifically, the Assistant FSO, BDM, Architect, and Senior Proposal Writer— exclusively dedicated to the provision of Nutanix services in breach of MSA Sections 2.1, 2.2, and 2.4, as well as Nutanix's Code of Business Conduct and

---

[51] Compl. ¶ 37.

[52] *Id.* ¶¶ 40–46.

[53] *Id.* ¶¶ 47–53.

[54] *Id.* ¶¶ 54–58.

Ethics.[55] Counterclaim Count I alleges IPNS also breached Section 2.2 by failing to ensure the Siloed Division was appropriately staffed and equipped to perform under the MSA.[56]

Nutanix's second counterclaim, Counterclaim Count II, seeks a declaration that: (1) IPNS materially breached the terms of the MSA; (2) Nutanix terminated the MSA and, as a result, no longer owes anything to IPNs under the MSA; and (3) Nutanix is entitled to the Clawback Payments and/or Setoff.[57]

Both parties have moved for partial judgment on the pleadings. IPNS's motion concerns Count III of its Complaint, Count II of Nutanix's Counterclaims, and most of Nutanix's affirmative defenses.[58] Nutanix's motion targets Count I of the Complaint and seeks judgment on its Counterclaim Count II.[59]

The Court heard argument during which the parties reported that Nutanix had agreed to withdraw most of the challenged affirmative defenses.[60] And by letter thereafter, Nutanix withdrew its Second, Third, Eighth, and Tenth Affirmative

---

[55] Nutanix's Answer, Affirm. Defenses, and CounterCl., 38.

[56] *Id.*

[57] *Id.* at 39–40.

[58] IPNS's Br. in Supp. of its Mot. for Partial J. on the Pleadings at 2.

[59] Nutanix's Br. in Supp. of its Mot. for Partial J. on the Pleadings at 8–12.

[60] Judicial Action Form (D.I. 35); Official Transcript (D.I. 40).

Defenses.[61] As a result, only Nutanix's Ninth and Eleventh Affirmative Defenses remain in play.[62] These defenses assert IPNS's claims are barred, in whole or in part, due to waiver and prior material breach.[63]

## II. STANDARD OF REVIEW

A party may move for judgment on the pleadings under this Court's Civil Rule 12(c).[64] Rule 12(c) review requires the Court to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party.[65] The complaint's well-pleaded facts are deemed as admitted.[66] Too, the Court assumes the truthfulness of all the complaint's well-pleaded allegations of fact.[67] Exhibits attached to the pleadings or incorporated by reference may be considered.[68] And the Court accords a party opposing a Rule 12(c) motion the same

---

[61] Letter for Judicial Review (D.I. 38).

[62] *Id.*

[63] Nutanix's Answer, Affirm. Defenses, and CounterCl., 27.

[64] Super. Ct. Civ. R. 12(c).

[65] *Almah LLC v. Lexington Ins. Co.*, 2016 WL 369576, at *4 (Del. Super. Ct. Jan. 27, 2016) (*citing Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.,* 624 A.2d 1199, 1205 (Del. 1993)).

[66] *Id.*

[67] *Id.*

[68] *OSI Sys., Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, 1090 (Del. Ch. 2006).

benefits as a party defending a motion under Rule 12(b)(6).[69]  In the end, the Court may grant a motion for judgment on the pleadings only when no material issue of fact exists and the movant is entitled to judgment as a matter of law.[70]

When there are cross-motions for judgment on the pleadings, the Court must accept as true all of each opponent's well-pleaded factual allegations and draw all reasonable inferences in favor thereof.[71]  In that respect, cross-motions for judgment on the pleadings function just as cross-motions for summary judgment.[72]

## III. PARTIES' CONTENTIONS

### A. IPNS'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

IPNS seeks judgment in its favor on (1) Count II of Nutanix's Counterclaims; (2) Count III of its Complaint; and (3) Nutanix's Ninth and Eleventh Affirmative Defenses.

First, IPNS argues Nutanix's Counterclaim Count II should be dismissed because it mirrors IPNS's pre-existing declaratory judgment claim, rendering the

---

[69]  *Id.*

[70]  *Id.*

[71]  *Id.*

[72]  *Silver Lake Off. Plaza, LLC v. Lanard & Axilbund, Inc.*, 2014 WL 595378, *6 (Del. Super. Ct. Jan. 17, 2014) (internal citations omitted); *Indian Harbor Ins. Co. v. SharkNinja Operating LLC*, 2020 WL 6795965, at *3 (Del. Super. Ct. Nov. 19, 2020).

- 16 -

counterclaim redundant.[73]  IPNS adds that the counterclaim will be "rendered moot" by the adjudication of IPNS's affirmative claims.[74]

Second, IPNS requests judgment in its favor on its own complaint's Count III. That is, IPNS asks the Court to find that Nutanix didn't successfully terminate the MSA and that indeed the MSA remains in effect.  Under IPNS's read, Section 17.8 of the MSA provides four means by which the parties could send notices to each other, and the only one that mentions email requires "*both* facsimile and electronic mail."  Incanting this language, IPNS argues that Nutanix's December 15, 2020 email failed to terminate the MSA because Nutanix neglected to send a duplicate of its message via fax.[75]

Third, IPNS turns to Nutanix's surviving affirmative defenses.  IPNS contends the Ninth Affirmative Defense should be dismissed because Nutanix has pleaded no facts demonstrating IPNS waived any right under the MSA.[76]  IPNS does not expressly refer to Nutanix's Eleventh Affirmative Defense in its motion.  In its reply brief, however, IPNS elaborated that "the notice required by Sections 16.4 and

---

[73]  *See* IPNS Opening Br. in Supp. of its Mot. for Partial J. on the Pleadings at 6–7 (collecting cases).

[74]  *See id.* at 7 (citing *Quantlab Grp. GP, LLC v. Eames*, 2019 WL 1285037 *4 (Del. Ch. Mar. 19, 2019)).

[75]  *Id.* at 8–9.

[76]  *Id.* at 21–22.

17.8 would be rendered a nullity if a party seeking to terminate a contract because of a material breach did not actually have to give notice as required by the MSA and could rely solely on the prior material breach doctrine."[77]

Finally, IPNS observes that Nutanix had previously suggested that the MSA doesn't require Nutanix to give notice before terminating the MSA for cause and that IPNS must show it was prejudiced by Nutanix's failure to strictly comply with the MSA's notice requirements. IPNS urges the Court to reject both arguments as contrary to the MSA's plain language.[78]

## B. NUTANIX'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

Nutanix seeks judgment in its favor on Count I of its Counterclaims and Count I of IPNS's Complaint. The former alleges IPNS materially breached the MSA by failing to hire and retain the Required Heads as mandated by the MSA, while the latter alleges Nutanix breached the MSA by failing to pay the $500,000 Target B Payment.

First, Nutanix argues it is entitled to judgment to the effect that IPNS materially breached the MSA by hiring Messrs. Penaloza and Prabhala as Required Heads. Nutanix contends there is no dispute that these individuals weren't

---

[77] IPNS's Reply Br. in Supp. of its Mot. for Partial J. on the Pleadings, 15.

[78] *See* IPNS Opening Br. in Supp. of its Mot. for Partial J. on the Pleadings, 10–14.

"exclusively dedicated" to the provision of Nutanix's services as obligated under the MSA. Nutanix notes that IPNS attempted to justify their non-Nutanix work by claiming they performed it only when they had nothing to do for Nutanix. But, says Nutanix, the MSA contains no language permitting IPNS to breach its exclusivity obligations under such circumstances.[79]

Similarly, Nutanix seeks judgment in its favor concerning the unpaid Target B Payment. The MSA provides that if IPNS does not have an Assistant FSO who is "exclusively dedicated" to MSA services then "Nutanix's obligation to make the Target A Payment and Target B Payment will terminate, and [IPNS] will have no further rights with respect to either such payment."[80] Because IPNS allegedly failed to have an FSO who was exclusively dedicated to providing MSA services, Nutanix says IPNS has no right to the Target B Payment.

## IV. DISCUSSION

IPNS and Nutanix each argue its opponent's motion should be denied because there are material issues of disputed fact. Both are right. So both motions are **DENIED**.

---

[79]   *See* IPNS Opening Br. in Supp. of its Mot. for Partial J. on the Pleadings, 8–12.

[80]   *Id.* (internal quotation omitted).

## A. IPNS IS NOT DUE JUDGMENT ON THE PLEADINGS.

IPNS asks the Court to dismiss Nutanix's declaratory judgment counterclaim, to enter judgment in its favor on its own declaratory judgment claim, and to dismiss Nutanix's Ninth and Eleventh Affirmative Defenses. IPNS's motion is **DENIED**.

### 1. *IPNS is not Entitled to Judgment on the Pleadings on Count II of Nutanix's Counterclaims.*

First, IPNS argues Nutanix's declaratory judgment counterclaim should be dismissed because it is a "mirror-image" of IPNS's affirmative claim.[81] IPNS is correct that Delaware courts will dismiss counterclaims that "seek declaratory relief that relates wholly and completely to the claim asserted in the complaint."[82] And IPNS is correct that the two declaratory judgment claims overlap in some respects. But the claims differ to the extent Nutanix, unlike IPNS, seeks a declaration that no notice was required to terminate the MSA. Because the claims are not entirely duplicative, the Court denies IPNS's motion with respect to Counterclaim Count II.

### 2. *IPNS is not Entitled to Judgment on the Pleadings on Count III of its Complaint.*

Most of IPNS's motion is dedicated to arguing that the MSA unambiguously required Nutanix to send notice by both email and fax to trigger termination of the

---

[81]  IPNS Opening Br. in Supp. of its Mot. for Partial J. on the Pleadings, 6.

[82]  *In re RJR Nabisco, Inc., S'holders Litig.*, 1990 WL 80466, at *1 (Del. Ch. June 12, 1990).

MSA. Because the Court disagrees that the relevant MSA terms are unambiguous, IPNS's motion must be denied as it concerns Count III of the Complaint.

IPNS asks the Court to interpret certain MSA terms. Judgment on the pleadings can be a proper framework for enforcing unambiguous contracts when there is no need to resolve material disputes of fact.[83] But the Court must first decide whether the contract at issue is in any way ambiguous by determining whether the "provisions in controversy are reasonably or fairly susceptible of different interpretations or may have one or more different meanings."[84]

Here, IPNS interprets the MSA as requiring Nutanix to utilize the notice procedures detailed in Section 17.8 alone to terminate the MSA for cause under Section 16.4. Although that is a reasonable interpretation of the MSA, it is not "the *only* reasonable construction as a matter of law."[85] Section 16.4 states in relevant part as follows:

> Nutanix will be entitled to terminate this Agreement immediately and for cause if: (i) Service provider . . . materially breaches any representation, warranty, covenant or agreement set forth in this Agreement . . . or any [Statement of Work] and such breach has not been cured within ten (10) business days after Nutanix provides Service Provider written notice thereof; *provided,*

---

[83]  *See Lillis v. AT & T Corp.*, 904 A.2d 325, 329–30 (Del. Ch. 2006) (internal citations omitted).

[84]  *Id.* at 330 (quoting *Rhone–Poulenc Basic Chemicals v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (1992).

[85]  *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003) (emphasis in original).

- 21 -

> *however*, that no cure period shall be required for a breach which by its nature cannot be cured; (ii) Service Provider fails to achieve the FSO Milestone on or prior to the day that is the three (3) month anniversary of the Effective Date; (iii) Service Provider fails to maintain, or any U.S. governmental agency or regulatory body takes any action in an effort to revoke or invalidate, Service Provider's facility security clearance; or (iv) Service Provider consummates an Acquisition Proposal with any person or entity other than Nutanix or one of its Affiliates.[86]

This section mentions notice only once: Before Nutanix may terminate the MSA for cause on account of a material breach by IPNS, Nutanix must provide "written notice" to IPNS and ten days for IPNS to cure. The section then immediately qualifies this requirement: "*provided*, *however*, that no cure period shall be required for a breach which by its nature cannot be cured."[87] This qualification does not expressly state that Nutanix need not provide *notice* for an uncurable breach; instead, it provides that Nutanix need not provide the ten-day *cure period*. So the MSA might reasonably be interpreted as allowing Nutanix to terminate the MSA for an incurable breach without providing written notice to IPNS. Again, the only purpose of notice in this section is to provide IPNS an opportunity to cure a material breach. If the material breach is uncurable, then notice to IPNS might be deemed futile. Therefore, Section 16.4 is ambiguous on whether Nutanix must utilize the notice requirements

---

[86]  MSA § 16.4 (emphasis in original).

[87]  *Id.*

of Section 17.8 before it may terminate the MSA following an incurable material breach by IPNS. Because Nutanix alleges IPNS's breaches were incurable,[88] IPNS is not entitled to judgment as a matter of law.

What's more, Section 16.4 mentions notice only in the context of a termination following a material breach by IPNS. But Section 16.4 proceeds to list other circumstances under which Nutanix may terminate the MSA for cause—none of which mention notice at all. Most notably, Nutanix may terminate the MSA if: "[IPNS] fails to achieve the FSO Milestone on or prior to the day that is the three (3) month anniversary of the Effective Date."[89] Nutanix alleges just that.[90] This adds another layer of ambiguity to the question of when Nutanix is required to provide notice before terminating the MSA under Section 16.4.

Even if Nutanix was required to provide notice under Section 17.8 before terminating the MSA for cause, IPNS would not necessarily be entitled to judgment on the pleadings. "When confronted with less than literal compliance with a notice provision, courts have required that a party substantially comply with a notice provision. The requirement of substantial compliance is an attempt to avoid 'harsh

---

[88]  Nutanix's Answer, Affirm. Defenses, and CounterCl., 37, 39.

[89]  MSA § 16.4 (emphasis in original).

[90]  *See* Nutanix's Answer, Affirm. Defenses, and CounterCl., 37.

results . . . where the purpose of these [notice] requirements has been met.'"[91]  Here, Nutanix emailed the notice of termination to IPNS on December 15, 2020.  Although IPNS denies receiving that email, the fact that IPNS was disputing the adequacy of Nutanix's notice by January 20, 2021 suggests IPNS must have gotten the message fairly quickly.[92]  So, even if one assumed Nutanix was required to comply with Section 17.8 in the first instance, there's a material issue of disputed fact on whether Nutanix did substantially comply therewith.

Finally, the Court notes Nutanix's claim—first raised in its answering brief— that it did provide notice to IPNS via facsimile on June 15, 2021.[93]  Where matters outside the pleadings are presented to and considered by the Court, the Court may convert the motion for judgment on the pleadings to one for summary judgment under Rule 56.[94]  The Court declines to do so here because IPNS's motion fails

---

[91]  *Gildor v. Optical Sols., Inc.*, 2006 WL 4782348 at *7 (Del. Ch. June 5, 2006) (internal citations and quotations omitted); *see also Kelly v. Blum*, 2010 WL 629850, at *8 (Del. Ch. Feb. 24, 2010) (denying plaintiff's motion for summary judgment based on substantial compliance with notice requirement).

[92]  *See* Compl. ¶ 35.

[93]  Nutanix's Answering Br. in Opp'n, 13.

[94]  *See* Del. Super. Ct. Civ. R. 12(c) ("If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."); *see also King v. McKenna*, 2015 WL 5168481, at *5 (Del. Super. Ct. Aug. 24, 2015).

regardless of Nutanix's reference to facts beyond the pleadings.[95]

In short, IPNS's motion raises material issues of disputed fact that underpin Count III of the Complaint. That means the motion on that count must be denied.

### 3. *IPNS is not Entitled to Judgment on the Pleadings on Nutanix's Affirmative Defenses.*

Finally, IPNS seeks judgment in its favor on Nutanix's affirmative defenses asserting waiver (Ninth) and prior material breach (Eleventh). Both requests must be denied.

First, Nutanix has adequately pleaded its waiver defense. "Waiver is the voluntary and intentional relinquishment of a known right."[96] "A contractual requirement or condition may be waived where (1) there is a requirement or condition to be waived, (2) the waiving party must know of the requirement or condition, and (3) the waiving party must intend to waive that requirement or condition."[97] Here, Nutanix has pleaded facts supporting each element. Section 17.8 states notice may be delivered "by both facsimile and electronic mail (*with notice*

---

[95] *See Ki-Poong Lee v. So*, 2016 WL 6806247, at *2 (Del. Super. Ct. Nov. 17, 2016) (declining to convert a motion for judgment on the pleadings because consideration of exhibits outside the pleadings was not required).

[96] *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005) (internal citations omitted).

[97] *Id.* (internal citations omitted).

*deemed given upon confirmation of receipt*)."[98] This could reasonably be interpreted as allowing the requirement of "both" facsimile and email to be waived if the recipient confirms receipt of either one or the other. Furthermore, it is undisputed that IPNS was aware of Section 17.8. But the final element is a bit paradoxical under the current facts. On the one hand, IPNS appears to have confirmed its receipt of Nutanix's termination notice by responding to it in January 2020; under the MSA, that might mean notice could be "deemed given." But on the other hand, the content of IPNS's response was to assert Nutanix's notice was inadequate, which might mean notice could not be "deemed given." This is a puzzle for another day. At this stage, Nutanix's waiver defense survives.

Second, Nutanix had adequately pleaded its defense based on prior material breach. As detailed below, there are factual issues as to whether IPNS's hiring practices breached the MSA and, assuming they did, whether that breach was material. Consequently, neither party is entitled to judgment on the pleadings regarding these issues.

## B. NUTANIX IS NOT DUE JUDGMENT ON THE PLEADINGS EITHER.

Nutanix's motion focuses on MSA Section 2.1, which states that "[a]ll Services shall be provided by full-time employees of [IPNS] who . . . (ii) are exclusively dedicated to the provision of Services under this Agreement and its

---

[98] MSA § 17.8 (emphasis added).

related SOWs."[99] In its Answer, IPNS admitted that "its records reflect that Mr. Penaloza performed some human resources work for IPNS" and that Mr. Prabhala "only performed work related to IPNS if (and when) there was no work for Mr. Prabhala to perform under the MSA."[100] Nutanix believes these admissions are sufficient to prove IPNS materially breached the MSA. Accordingly, Nutanix contends that it is entitled to Clawback Payments totaling $1 million and that IPNS's right to the Target B Payment has been forfeited.

Nutanix's motion is **DENIED** because there are both matters of contract interpretation and material issues of disputed fact yet to be resolved. One issue is that the "exclusively dedicated" provision in Section 2.1 of the MSA is reasonably susceptible to more than one interpretation. Nutanix interprets Section 2.1 as prohibiting the Required Heads from performing any non-Nutanix work for IPNS for any reason whatsoever. Although that is one reasonable reading of Section 2.1, it is not "the *only* reasonable construction as a matter of law."[101] For instance, IPNS interprets Section 2.1 as allowing the Required Heads to perform work for IPNS when they lacked any work to perform on behalf of Nutanix. While this interpretation might seem less probable than Nutanix's, it is not entirely

---

[99] MSA § 2.1.

[100] IPNS's Answer to CounterCl. at 9–11.

[101] *VLIW Tech.*, 840 A.2d at 615 (emphasis in the original).

- 27 -

unreasonable. It is difficult to imagine the parties intended that the Required Heads idle away the hours in the event they lacked any work related to Nutanix.[102]

Even if IPNS breached the MSA by allowing Messrs. Penaloza and Prabhala to perform non-Nutanix work, it is a factual issue whether that breach was material. A material breach is "a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract."[103] Delaware courts routinely recognize that materiality is a question of fact that is ordinarily not suited for judgment as a matter of law.[104] And that is particularly so here. The pleadings are largely silent on the specifics of Messrs. Penaloza's and Prabhala's joint responsibilities with IPNS. The Court therefore cannot yet

---

[102] To determine whether certain of a contract's contested language is unambiguous, Delaware "adheres to the objective theory of contracts." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010). That requires a court to interpret a particular contractual term to mean "what a reasonable person in the position of the parties would have thought it meant." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006).

[103] *Shore Invs., Inc. v. Bhole, Inc.*, 2011 WL 5967253, at *5 (Del. Super. Ct. Nov. 28, 2011) (quoting 23 Williston on Contracts § 63:3 (4th ed.)).

[104] *See Matthew v. Laudamiel*, 2014 WL 5499989, at *2 (Del. Ch. Oct. 30, 2014) ("Typically, whether a breach is material is a question of fact that cannot readily be resolved under the summary judgment standard."); *Est. of Buller v. Montague*, 2020 WL 996883, at *5 (Del. Super. Ct. Mar. 2, 2020) ("Materiality is, of course, a question of great specificity. It is a question of fact and one that is ordinarily not suited for summary judgment.") (quoting *Pac. Ins. Co. v. Higgins*, 1992 WL 212601, at *6 (Del. Ch. Sept. 2, 1992)); *see also Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 n.9 (Del. 1993) (noting that the "summary judgment standard provides guidance to courts reviewing motion for judgment on the pleadings") (internal citations omitted).

determine whether IPNS's conduct rose to the level of a material breach, even were it to assume that conduct was a breach in the first instance.

Because there are material issues of disputed fact, Nutanix is not entitled to judgment on the pleadings. Nutanix's motion is **DENIED**.

## V. CONCLUSION

Each party's motion for judgment on the pleadings must be **DENIED**. Neither party has demonstrated that its reading of the contested operable MSA language represents the *only* reasonable construction as a matter of law. And neither has demonstrated that its version of what happened under the MSA adequately resolves the material issues of disputed fact.

**IT IS SO ORDERED.**

Paul R. Wallace, Judge

Original to Prothonotary

cc: All Counsel via File and Serve