Charles LILLIS, Gary Ames, Richard Post, Frank Eichler, Robert Crandall, Lou Simpson, Pierson Grieve, Richard McCormick, Janice Peters, Pearre Williams, Roger Christensen, Doug Holmes, Steven Boyd, Patti Klinge, Connie Campbell, Sharon O'Leary, Jim Taucher, Bud Wonsiewicz and Daniel Yohannes, Plaintiffs,

v.

AT & T CORP. and AT & T Wireless Services, Inc., Defendants.

C.A. No. 717–N.

Court of Chancery of Delaware, New Castle County.

Submitted: April 17, 2006.
Decided: May 22, 2006.

Kevin G. Abrams, Abrams & Laster, L.L.P., Wilmington, DE; Miranda S. Schiller, Joshua S. Amsel, Weil, Gotshal & Manges, L.L.P., New York City, for Plaintiffs.

Todd C. Schiltz, Wolf, Block, Schorr and Solis–Cohen, L.L.P., Wilmington, DE; Michael L. Banks, William P. Quinn, Jeremy P. Blumenfeld, Morgan Lewis & Bockius, L.L.P., Philadelphia, PA, for Defendants.

## OPINION

LAMB, Vice Chancellor.

This case arises from a dispute between former officers and directors of a telecommunications company and that company's successors in interest concerning the enforcement of contracts granting stock options. The plaintiffs have moved for judgment on the pleadings on Count IV of their complaint, seeking the attorneys' fees and expenses incurred in bringing their case under a contractual provision that authorizes such payments for certain claims. The question in this case specifically is the extent to which a contractual provision which provides for attorneys' fees arising "in connection with" a written agreement requires the indemnifying party to pay for litigation on grounds, and against parties, that are not expressly enumerated in that agreement. Under the facts of this case, the court concludes that the attorneys' fees provision in question is inherently broad in character, and encompasses the claims the plaintiffs have brought. Therefore, the court will grant the plaintiffs' motion pursuant to Court of Chancery Rule 12(c).

## I.

### A. *The Plaintiffs' Case In Chief*

The facts of this case are set forth in this court's previous opinion on the plaintiffs' earlier Rule 12(c) motion, decided on August 26, 2005. Nonetheless, the court will briefly summarize the facts here for ease of reference. In short, the plaintiffs in this case are former officers and directors of MediaOne Group, Inc., a broadband telecommunications company, and former officers and directors of U.S. West, MediaOne's former parent corporation.[1] As part of their compensation, the plaintiffs all received stock options from Me-

1. The plaintiffs include Charles Lillis, the Chairman, President and Chief Executive Officer of MediaOne; Gary Ames, the President and CEO of MediaOne International; Richard Post, the Executive Vice President and Chief Financial Officer of MediaOne; Frank Eichler, the General Counsel and Secretary of MediaOne; Robert Crandall, Lou Simpson, Pierson Grieve, Janice Peters, Pearre Williams, Roger Christensen, Doug Holmes, Steve Boyd, Patti Klinge, Connie Campbell, Sharon O'Leary, Jim Taucher, Bud Wonsiewicz and Daniel Yohannes, former directors and/or officers of MediaOne; and Richard McCormick, the former CEO and Chairman of U.S. West, formerly MediaOne's parent corporation. Compl. 9–11.

diaOne pursuant to the MediaOne 1994 Stock Plan,[2] and also pursuant to non-qualified stock option contracts with MediaOne.[3] Importantly, the 1994 plan included provisions protecting the value of the MediaOne options in the event of future changes of control.

In 2000, MediaOne was acquired by AT & T. As part of the merger agreement, AT & T agreed to honor the terms of MediaOne's compensation programs,[4] including those at issue in this case, and the plaintiffs exchanged their MediaOne options for new options in AT & T which had an equivalent value to those they previously held. At some point after MediaOne was acquired by AT & T, the employment of all but one of the plaintiffs was terminated by AT & T.[5]

In June 2001, Wireless was spun off from AT & T as a separate business. In order to maintain the value of the plaintiffs' stock options, the AT & T options were adjusted by granting options in the now-independent Wireless, and by granting new options in AT & T. Finally, in 2004, Wireless agreed to a merger with Cingular.[6] Despite alleged informal assurances from both Wireless and AT & T that the plaintiffs' option values would be protected in the Cingular/Wireless merger,[7] the merger agreement provided, according to the complaint, that all Wireless options would be cancelled in the transaction, and that the plaintiffs would be paid the spread between the merger price and the exercise price.[8] That payment is insufficient, in the plaintiffs' view, because it disregards the intrinsic value of stock options based on the possibility that the underlying stock may rise in value. Regardless of whether their options had an exercise price above or below the merger price,[9] therefore, the plaintiffs believe that they were due additional consideration to take into account the value of the cancelled options.

The documents relevant to the plaintiffs' substantive claims (stated in Counts I through III of the complaint), in summary, include the 1994 MediaOne Plan, the non-qualified stock option agreements, the 1999 merger document between AT & T and MediaOne, and the 2004 Cingular/Wireless merger agreement. On the basis of those documents, Counts I through III of the complaint allege that the defendants violated their contractual obligations and committed common law negligent misrepresentation in allowing the options to be cancelled at inappropriate values in the Cingular/Wireless merger. The plaintiffs seek both money damages and equitable relief.

### B. *Procedural History*

This litigation has a tortured history, which is relevant to the court's disposition of this motion. The plaintiffs filed their complaint on September 24, 2004. AT & T answered on December 8, 2004, making what the court later called "extraordinary"

---

2. Compl. Ex. A.

3. Compl. Ex. B.

4. Compl. Ex. C § 7.5.

5. The complaint explains that the only exception was Connie Campbell, who stayed with AT & T for two years following the MediaOne/AT & T merger and the Wireless split-off.

6. Compl. Ex. O.

7. Compl. 29–31.

8. *Id.* at § 4.5(a).

9. Compl. Ex. F.

admissions.[10] Wireless, in contrast, filed an answer on November 18, 2004 rejecting the plaintiffs' allegations. The reason for this disparity in strategy between the co-defendants, apparently, was the pendency of an arbitration claim made by AT & T against Wireless, in which AT & T sought to prove that all contractual violations were the responsibility of Wireless alone.[11]

Changing direction on June 9, 2005, in a letter to the court, AT & T purported to "correct an argument" in its answering brief.[12] In fact, as the court observed in its previous opinions in this case, AT & T attempted to take back many of the damaging admissions it made in its answer and its brief.[13] As the court noted, the reason for AT & T's *volte face* was easy to discern. On June 7, 2005, counsel for Wireless forwarded to the court a copy of the May 23, 2005 decision of the arbitral tribunal, in which the tribunal found for Wireless, and denied AT & T recovery.[14] Confronting the failure of its chief litigation strategy, AT & T sought to change its position.

After due consideration, the court granted AT & T's motion to amend. However, the court noted that in its initial answer, AT & T made "an irrefutably deliberate choice to admit the substance of the plaintiffs' claim ... but pointed the finger at Wireless as the party obligated to make the plaintiffs whole."[15] Therefore, the court allowed AT & T to amend its answer, but only if AT & T agreed to pay the reasonable legal fees and costs incurred by the plaintiffs in bringing their Rule 12(c)

motion on the basis of AT & T's initial answer. The court hoped, at that point, that this litigation could proceed with dispatch.

Despite that aspiration, this case has continued to be mired in complex maneuvering. Since late February 2006, AT & T and Wireless have been represented by the same counsel. They have once again reformulated AT & T's litigation strategy, and, on March 30, 2006, sought leave from the court to amend AT & T's answer a second time to assert a new statute of limitations defense to some of the plaintiffs' claims, and to modify several responses to accurately reflect AT & T's new position. The court heard argument on that motion and on the plaintiffs' motion for judgment on the pleadings under Court of Chancery Rule 12(c), which is the main subject of this opinion, on April 17, 2006.

Despite the court's belief that AT & T, as a sophisticated client advised by an extensive internal legal administration, ought to be held accountable for its previous litigation strategy, the court granted AT & T's motion for leave to amend its answer at oral argument. As the court made clear from the bench, however, and now reaffirms, if it later becomes apparent that the defendants have abused the court's discretion to raise a frivolous defense by amending their answer, the court will address the prejudice done to the plaintiffs with sanctions against AT & T.[16] In addition, the court reserved judgment on the plaintiffs' Rule 12(c) motion, pending this written opinion.

**10.** *Lillis v. AT&T Corp.*, 2005 WL 3111991, at *1, 2005 Del. Ch. Lexis 175, *1 (Del.Ch. Nov. 17, 2005).

**11.** *Lillis v. AT&T Corp.*, 896 A.2d 871, 875, 2005 Del. Ch. Lexis 130, *9–10 (Del.Ch. Aug. 26, 2005).

**12.** *Id.* at 876, 2005 Del. Ch. Lexis 130 at *10.

**13.** *Id.*

**14.** *Id.* at 876, 2005 Del. Ch. Lexis 130 at *10–11.

**15.** *Id.* at 879, 2005 Del. Ch. Lexis 130 at *19.

**16.** Tr. at 37:10–17.

## C. The Instant Motion

The motion *sub judice* does not concern the merits of the case brought by the plaintiffs against AT & T and Wireless. Rather, the plaintiffs have brought this motion for judgment on the pleadings under Rule 12(c) only as to Count IV of their complaint, and only against AT & T. That count seeks the payment of legal fees and expenses in prosecuting the plaintiffs' case in chief, as set forth in Counts I through III, against both defendants. The basis for that claim, according to the complaint, is certain "change of control" agreements signed by the plaintiffs with MediaOne prior to the MediaOne/AT & T merger.[17] Those agreements purportedly guarantee that should the plaintiffs ever need to bring litigation to enforce the rights asserted in the three substantive counts of the complaint, they would be reimbursed for all legal fees incurred in bringing those claims regardless of the outcome of the litigation. The indemnification provision is contained in Section IV(f) of the relevant agreement, and provides as follows:

> The Company shall pay to Executive all legal fees and expenses as and when incurred by Executive in connection with this Agreement, including all such fees and expenses, if any, incurred in contesting or disputing any Termination or in seeking to obtain or enforce any right or benefit provided by this Agreement, regardless of the outcome, unless, in the case of a legal action brought by or in the name of the Executive, a decision is rendered pursuant to Section XI, or in any other proper legal proceeding, that such actions was not brought by Executive in good faith.[18]

In the plaintiffs' view, Section IV(f) is implicated in their claims because the change of control agreement contains a guarantee that the covered executives will continue to receive compensation promised by predecessor companies. Section IV(a) of the agreement describes various benefits that executives are to receive in the event of a change of control:

> The Company shall pay Executive his full base salary through the Termination date ... plus all other amounts to which Executive is entitled under any compensation plans(s) or program(s) of the Company applicable to Executive at the time such payments are due.[19]

As described more fully below, the plaintiffs believe that the option contracts in question are "compensation plan(s) or program(s)" as envisioned by Section IV(a), and therefore when the agreements were signed, MediaOne became obligated to reimburse the legal expenses incurred in bringing claims related to those grants. Under the MediaOne/AT & T merger agreement, AT & T concededly assumed the MediaOne change of control agreements and the obligations therein.[20] Therefore, the plaintiffs believe that AT & T is liable for their legal fees.

## II.

■ This court will grant a motion for judgment on the pleadings pursuant to Rule 12(c) when there are no material issues of fact and the movant is entitled to judgment as a matter of law.[21] As this court has noted previously, "judgment on the pleadings ... is a proper framework for enforcing unambiguous contracts because there is no need to resolve material

---

17. Compl. Ex. D.

18. *Id.* at § IV(f).

19. Compl. Ex. D § IV(f).

20. Compl. Ex. C § 7.5(d).

21. *McMillan v. Intercargo Corp.,* 768 A.2d 492, 499–500 (Del.Ch.2000).

disputes of fact." [22] What the court must do to resolve this case, therefore, is to decide whether the contract at issue is in any way ambiguous, by determining whether the "provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." [23] If the contract's meaning is unambiguous, the court must grant judgment on the pleadings in favor of the moving party.

## A. The Parties' Contentions

This case, according to the plaintiffs, is simple. Section IV(f) of the change of control agreement necessarily applies to all the plaintiffs, and to AT & T. It provides for unconditional advancement of legal fees incurred in suits brought to vindicate the plaintiffs' rights to any form of compensation arising out of the change of control provisions. Because the plaintiffs' option grants are a form of compensation guaranteed by Section IV(a), they are therefore owed reimbursement for all legal expenses incurred in bringing any of their claims in this case, on whatever legal theory.

According to AT & T, in contrast, Section IV(f) of the change of control agreement governs only the narrow issue of whether or not the plaintiffs would receive options under their employment agreements at the time of a change in control. In the defendant's view, in other words, had the plaintiffs failed to receive options to purchase shares of AT & T stock in the aftermath of the MediaOne/ AT & T merger, to replace the MediaOne options that had been issued before MediaOne merged with AT & T in 2000, they would have a claim for which they were due attorneys'

fees under Section IV(f) of the change of control agreement. But the plaintiffs concededly received those options, thus fulfilling AT & T's obligations under the change of control agreement. The plaintiffs' claim now, therefore, is a fundamentally different one: that the defendant violated the contract underlying the option grant, which the defendant allegedly assumed. That claim, in the defendant's view, can be governed only by the specific terms of the option agreement, which contains no attorneys' fees provision. Therefore, at the threshold, AT & T claims that the plaintiffs cannot be entitled to fees in this case.

Even if there are some hypothetical claims concerning the options for which AT & T must pay attorneys' fees, AT & T believes that the counts in the complaint fall outside that narrow group of possible allegations. Simply put, all three substantive counts of the complaint include claims against Wireless. Counts II and III, specifically, make allegations on the same grounds against both Wireless and AT & T. The reason this is significant, according to AT & T, is that it evidences the fact that the plaintiffs' allegations cannot possibly arise out of the change of control agreement, to which Wireless was never a party. The very fact that the plaintiffs can make the same allegations against both defendants, in other words, shows to AT & T's satisfaction that those claims do not arise out of AT & T's specific and targeted responsibilities under the change of control agreement. Whatever the merits of the plaintiffs' case, therefore, assigning AT & T liability here would require AT & T to shoulder costs for claims that have nothing

22. *DeLucca v. KKAT Mgmt.*, 2006 Del. Ch. Lexis 19, *22 (Del. Ch. Jan. 30, 2006); *NBC Universal v. Paxson Commc'ns*, 2005 Del. Ch. Lexis 56, *13 (Del. Ch. Apr. 29, 2005).

23. *Rhone–Poulenc Basic Chemicals v. American Motorists Ins.*, 616 A.2d 1192, 1196 (1992).

to do with the responsibilities it undertook in Section IV(f).

## III.

This court has recently ruled on an extremely similar set of facts in *DeLucca v. KKAT Management*,[24] which also concerned a motion for judgment on the pleadings arising out of an attorneys' fees provision in an executive contract. There, a former employee and principal of a limited liability company sought advancement under a contractual provision that promised payment for losses "in connection with or arising out of or related to the operations or affairs of" certain of the companies that the plaintiff had administered.[25] Part of the LLC's argument in resisting advancement was that the claims at issue in the case were beyond the scope of the indemnification provision, because the suit for which advancement was being sought concerned discrete issues of management disloyalty relating to what was, effectively, the corporate parent of the entity that had promised advancement. The LLC's defense to advancement, in other words, was similar to that raised by AT & T here: that the contractual provision at issue did not cover the claims for which the indemnitee demanded payment.

The court resolved the question presented by *DeLucca*, consistent with the procedural posture of a motion under Rule 12(c), by closely examining the contractual language of the advancement provision, which it determined used "ca-

pacious terms" to define the scope of indemnification.[26] Central to the court's conclusion was the fact that, under Delaware law, the phrases "connecting with," "relating to," and "arising out of," all used in that provision, are paradigmatically broad terms. Indeed, the court noted that in the context of disputes over the applicability of arbitration clauses, where similar questions of scope often arise, precisely the same language has been interpreted as unquestionably broad in reach.[27] The court also concentrated on the use of the terms "operations" and "affairs," which it concluded were meant to encompass a wide range of business dealings, in determining that the indemnification provision at issue was unambiguously expansive. Having made that decision, the court rejected the defendants' argument that a broad reading of the provision would lead to an "absurd" result. To the contrary, the court observed, a rational contracting party in the defendants' position might well have sought to induce talented individuals to accept employment by promising that the parent would provide advancement in the event of any charges of misconduct relating to the operating subsidiaries.[28] The court found that, in view of repeated admonitions in cases involving advancement and indemnification, "there is no requirement that advancement provisions be written broadly or in a mandatory fashion. But when an advancement provision is, by its plain terms, expansively written and man-

---

24. 2006 Del. Ch. Lexis 19.

25. *Id.* at *25.

26. *Id.* at *22.

27. *Id.* at *22 n. 33. The analogy between indemnification and arbitration is strengthened by the fact that both are strongly favored by the public policy of this state. Indemnifi-

cation provisions should, therefore, be interpreted with an eye toward that policy, providing coverage whenever it is reasonable. *Id.* at *23, *citing Perconti v. Thornton Oil Corp.*, 2002 WL 982419, 2002 Del. Ch. Lexis 51,*3 (Del.Ch. May 3, 2002).

28. *DeLucca*, 2006 Del. Ch. Lexis at *45.

datory, it will be enforced as written."[29] On that basis, the court granted the employee's motion for judgment on the pleadings as to advancement and fees on fees.

■ This case, which is similar to *DeLucca* in many ways, can be resolved by employing the same type of analysis. Taking Section IV(a) first, it seems clear to the court that the option grants at issue in this case are "compensation plan(s) or program(s)" as contemplated by the agreement. The consistency of that meaning with the contract is evidenced not only by common sense, which tells us that compensation need not be, and rarely is, limited to cash payments, but also by the documents appended and incorporated into the complaint. As AT & T conceded at oral argument,[30] the real gravamen of the dispute between the parties here is not whether the phrase "compensation plan(s) or program(s)" includes option contracts, but rather the proper scope of the indemnification provision in Section IV(f).

Turning to that question, then, it seems plain at the outset that the recitals prefacing the change of control agreement strongly evidence MediaOne's intent to provide its executives with comprehensive coverage if, as seemed likely in the rapidly developing telecommunications industry, MediaOne was acquired or otherwise changed hands. As the second paragraph of the agreement stipulates:

> Accordingly, the Board has determined that appropriate steps should be taken to reinforce and encourage the continued retention of certain members of the Company's management, including your-

self, and the attention and dedication of management to their assigned duties without distraction in the face of potentially disturbing circumstances arising from the possibility of a change of control.

That unambiguous intent was enacted by the plain language of the agreement. First, and precisely like the provision in *DeLucca*, Section IV(f) promises the payment of all legal fees and expenses "in connection with the Agreement." That language, as *DeLucca* held, constitutes the broadest possible authorization, and clearly envisions that any dispute plausibly related to the agreement is within the purview of Section IV(f).

The sweeping nature of "in connection with" is bolstered by the language chosen by the parties to describe the content of that broad, and necessarily encompassing, phrase. Specifically, Section IV(f) provides that legal fees would be provided for all expenses relating to the agreement, *including* those incurred while "seeking to obtain or enforce any right or benefit provided by this Agreement, regardless of the outcome...." The first half of that phrase, and specifically the word "enforce," which means to "cause to take effect" in normal parlance,[31] clearly suggests that Section IV(f) is meant to operate not only to ensure that the plaintiffs would receive compensation in the future, but also that the promised compensation had some content. Indeed, had Section IV(f) been intended only as a way to ensure that the claimants received some options, this provision need not have included the verb "enforce." "Obtain," which means "to gain or obtain

---

**29.** *Id.* at *45–46.

**30.** As counsel for the defendant explained in the course of arguing that the attorneys' fees provision covered only the plaintiffs' receipt of stock options, "the change of control agreements guaranteed to these people severance,

medical benefits, and that they would receive their stock options." Tr. at 13:1–8

**31.** Webster's Third New International Dictionary of the English Language 751 (1976).

possession," would have been more than sufficient to reach that limited goal.[32] It is, in short, the very essence of the plaintiffs' claims in their case in chief is that they seek to *enforce* their rights to options in the same form as was promised to them, albeit on a variety of legal theories and against two separate defendants. Reading Section IV(f) consistently with AT & T's reading, in contrast, would render a key contractual phrase essentially meaningless. Our courts are justly loathe to treat contracts drafted by a sophisticated party like MediaOne so lightly.

Finally, the court notes that Section IV(f) differs from the provision in *DeLucca* in that it promises contemporaneous payment of fees regardless of the outcome of the litigation. In the spectrum of advancement and indemnification provisions, language that provides for payment with no provision for reimbursement if the litigation fails necessarily stand as examples of the broadest possible provision permitted under our law.[33] That language, in other words, only further evidences the change of control agreement's intent to broadly protect the plaintiffs in these circumstances.

■ In sum, the plaintiffs' allegations that AT & T and Wireless have violated their obligation to provide them with options of a certain value necessarily falls within Section IV(f)'s fee-shifting provision. That is true as a matter of the plain language of the agreement, as described above. But it is equally true as a matter of contractual logic. In short, the defendant's highly cramped reading of Sections IV(a) and IV(f) would reduce the plaintiffs' entitlement under the change of control agreement to a near-valueless promise that would protect only the form, but not the substance, of the plaintiffs' rights to compensation. Faced with the possibility of a takeover in 1999, it is inconceivable to the court that a document couched in the sweeping language of that at issue here could have been meant to have such a limited effect, and to provide such a limited entitlement to attorneys' fees for the purpose of vindicating the plaintiffs' rights. Rather, as the plaintiffs maintain, the text of the change of control agreement demonstrates that the plaintiffs and MediaOne signed a document that sought to give MediaOne's executives broad assurances of their rights by guaranteeing that they would be able to litigate their claims to their conclusion if a new, potentially less sympathetic, entity acquired the company.[34] To hold otherwise here would be to dramatically revise the change of control

32. *Id.* at 1559.

33. *VonFeldt v. Stifel,* 1999 WL 413393, *2, 1999 Del. Ch. Lexis 131, *7 (Del.Ch. June 11, 1999).

34. AT & T, in its papers, raises in passing the argument that even if the court finds it liable for attorneys' fees, it should be liable only for those fees that the plaintiffs have incurred in bringing their claims against AT & T itself, and not for those incurred in bringing claims against Wireless. The court considered and rejected this argument in similar circumstances in connection with the fees assessed for the previous Rule 12(c) motion. *Lillis,* 2005 WL 3111991 at *1, 2005 Del. Ch. Lexis 175 at *1–2 ("Thus, the court's decision to condition any grant of leave to AT & T to amend its answer on a payment of the plaintiffs' fees and expenses in bringing the motion can only be understood to mean *all* fees and expenses incurred, not simply some arbitrary portion attributable solely to the relief sought against AT & T."). The court reaches the same conclusion under the facts of this motion, and therefore grants fees for all the claims alleged in the complaint. Simply put, Section IV(f) provides reimbursement for all fees incurred by the plaintiffs in seeking to enforce their rights. Given the broad sweep of the change of control agreement, this includes litigation against AT & T itself, and also litigation against other parties that arises in connection with the agreement. Of course, this grant is not an invitation for the plaintiffs to abuse their contractual rights. In the end,

agreement, and to leave MediaOne's directors and officers without protections that they had been unambiguously granted by contract, and upon which they reasonably could have relied.[35]

## IV.

For the reasons set forth herein, the plaintiffs' motion pursuant to Court of Chancery Rule 12(c) is GRANTED. IT IS SO ORDERED.

the plaintiffs' actions are limited by the implied covenant of good faith and fair dealing, which inures to all Delaware contracts. *Dunlap v. State Farm Fire and Cas.*, 878 A.2d 434 (Del.2005). But that limitation does not preclude the desired recovery here.

35. The court notes here the conflicting authority represented by *Kleinberg v. Radian Group Inc.*, 2003 WL 22420501, 2003 U.S. Dist. Lexis 18902 (S.D.N.Y Oct. 24, 2003), adopted by *Kleinberg v. Radian Group Inc.*, 2003 WL 22723014, 2003 U.S. Dist. Lexis 20743 (S.D.N.Y. Nov. 18, 2003). In that case, an executive sought payment of attorneys' fees under a contract which promised payment of all "reasonable attorney fees and expenses incurred by the Executive in connection with, but not limited to, a bona fide dispute regarding the application of any and all the provisions under this Agreement, [or] the Executive's seeking to obtain or enforce any right or benefit provided under this Agreement...." *Id.* at *3, 2003 U.S. Dist. Lexis 18902 at *7–8. The court concluded, however, that the allegations in the executive's complaint fell outside the scope of that agreement, and therefore that the executive was not due fees for the claims alleged. While the contractual language at issue in *Kleinberg* closely resembles the language in this case, it is nonetheless inapt for application here. Most crucially, as the *Kleinberg* court explained, the fact that under New York law contractual provisions to pay attorneys' fees must be strictly construed was of "great significance" to its decision. *Id.* at *4, 2003 U.S. Dist. Lexis 18902 at *10. That presumption does not apply in Delaware advancement or indemnification cases, and, in fact, the court has determined that Section IV(f) should be broadly construed. Even if the federal magistrate court in *Kleinberg* had applied Delaware law to the provision at issue, the court notes that the contractual language in that case, was significantly narrower than that at issue here, and notes additionally that the claims raised by the executive were somewhat less closely related to the agreement in which the indemnification provision in *Kleinberg* was found. Although of some persuasive authority, therefore, *Kleinberg* has no general application to this case.