# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| D.R. HORTON, INC. – NEW JERSEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-0070-BWD |
| | ) | |
| BUNTING MACKS LLC and | ) | |
| ROXANA ROAD LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## FINAL REPORT

Final Report:  June 18, 2024
Date Submitted:  May 29, 2024

Daniel F. McAllister, MCALLISTER FIRM LLC, Wilmington, Delaware; *Attorney for Plaintiff D.R. Horton, Inc. – New Jersey*.

Sean A. Meluney and William M. Alleman, Jr., MELUNEY ALLEMAN & SPENCE, LLC, Lewes, Delaware; *Attorneys for Defendants Bunting Macks LLC and Roxana Road LLC*.

**DAVID, M.**

In this action, plaintiff D.R. Horton, Inc. – New Jersey ("Horton") seeks to compel defendant Bunting Macks LLC ("Bunting Macks") to specifically perform its obligations under a Land Purchase Contract (the "Agreement") and close on the phased sale of real estate in Selbyville, Delaware. The Agreement provides that time is of the essence and includes a mechanism setting an outside date by which the closing "shall" occur.

Horton alleges that Bunting Macks breached the Agreement by failing to diligently and in good faith seek certain governmental approvals and encumbering the property. As the outside closing date approached, Horton told Bunting Macks that it "ha[d] not yet made a decision as to" whether it would exercise its contractual right to extend the outside closing date. Ultimately, it chose not to do so; instead, it allowed the outside closing date to pass, waited another month, then initiated this action for specific performance. In this final report, I conclude that the remedy of specific performance is no longer available under the Agreement.

## I.      BACKGROUND

### A.      The Agreement And The Amendments

This case concerns an Agreement pursuant to which Horton agreed to purchase, and Bunting Macks agreed to sell, property in Selbyville, Delaware (the "Property"), to be developed into a residential community called "Coastal Villages." Compl. ¶ 1, Dkt. 1.

The Agreement governs the purchase of the Property in four phases. Compl., Ex. A [hereinafter, "Agt."] § 3. Section 5(a)(2) of the Agreement conditions Horton's obligation to close on the purchase of the Property in each phase on certain "Primary Contingencies," including the issuance of governmental "Approvals":

> Buyer's obligation to close on the purchase of the Property under this Contract is contingent upon each and all of the following (collectively, the "Primary Contingencies"): . . . all applicable governmental authorities having jurisdiction over the Property, including, without limitation, the Town of Selbyville, Sussex County, and the State of Delaware (and their respective agencies) (collectively and as applicable, the "Governing Jurisdiction") shall have issued, or be in a position to issue, subject to Buyers posting of bonds and payment of permit and Inspection fees for grading site utilities and paving, building permit and connection fees, all final, non-appealable site plan approvals, construction plan approvals, zoning approvals, variances, land disturbance permits, wetlands permits, stormwater permits, curb cut approvals, and other Federal, State and municipal approvals and permits that are necessary for the development of the Phase of the Property being purchased as reflected by this Agreement (collectively the "Approvals") . . . .

Agt. § 5(a)(2). Effective June 8, 2021, the parties executed a second amendment to the Agreement (the "Amendment"). Section 1(e) of the Amendment amends Section 5(f) of the Agreement to require that "Seller shall diligently and in good faith seek the Approvals." Compl., Ex. B § 1(e).

Amended Section 6(b) sets the closing date for Phase II. *Id*. § 1(f)(b). It provides that "[t]he Phase II Closing shall be held on or before that date which is one (1) year after the Phase I Closing ('Phase II Closing Date') and is conditioned upon the satisfaction of all of the Primary Contingencies with respect to Phase II at

2

least thirty (30) days prior to the Phase II Closing Date." *Id*. If the Primary Contingencies are not satisfied thirty days prior to the Phase II Closing Date, the Agreement creates a decision tree. In that case, "Buyer may, in its sole and absolute discretion, waive such Primary Contingencies and proceed to the Phase II Closing." *Id*. Or, "[i]f Buyer elects to not waive such Primary Contingencies and proceed to the Phase II Closing, then either party may extend the Phase II Closing Date in successive thirty (30) day periods (each a 'Phase II Extension Period'), not to exceed one hundred eighty (180) days in total (the 'Phase II Outside Closing Date'), to allow Seller additional time to satisfy the Primary Contingencies applicable to Phase II Closing." *Id*.

Under the second scenario—where Horton does not waive the Primary Contingencies and either party instead elects to extend the Phase II Closing Date— the Agreement provides three additional paths. If the Primary Contingencies still "are not satisfied at least thirty (30) days prior to the Phase II Outside Closing Date, Buyer may, in its sole and absolute discretion, (i) terminate this Contract in its entirety and receive a refund of the remaining unapplied portion of the Earnest Money, subject to delivery of the Release, or (ii) waive such Primary Contingencies and proceed to the Phase II Closing." Compl., Ex. B § 1(f)(b). Or, Section 6(b), as amended, provides a third alternative:

> If Seller, despite Seller's good faith efforts, has not obtained the
> Approvals with respect to Phase II at least thirty (30) days prior to the

3

Phase II Outside Closing Date, then Buyer may, upon written notice to Seller delivered prior to the Phase II Outside Closing Date (the 'Phase II Approvals Election Notice'), elect to pursue receipt of the Approvals, and in such event the Phase II Outside Closing Date shall be extended by an additional sixty (60) days and Seller shall have an additional sixty (60) days to obtain the Approvals. In the event Seller still has not obtained the Approvals within such sixty (60) day period, the Phase II Outside Closing Date shall be extended for a period of six (6) months from the expiration of such sixty (60) day period to allow time for Buyer to obtain the Approvals with respect to Phase II (the 'Phase II Approvals Extension Period').[1]

*Id*.

If Bunting Macks breaches its obligations under the Agreement, Section 15(b) states as follows:

If Seller defaults in the performance of any covenant or obligation hereunder, or if any of Seller's representations or warranties prove to be false, inaccurate, incomplete or misleading in any material respect, then Buyer's sole and exclusive remedy shall be either: (1) to seek specific performance of this Contract, or (2) to terminate this Contract, receive an immediate refund of all Earnest Money and sue for damages for Seller's breach; provided, however, that any damages recoverable

---

[1] Section 6(b), as amended, further provides:

In the event the Approvals are obtained during the Phase II Approvals Extension Period, then Buyer shall receive a reimbursement from Seller at Closing for the actual costs incurred by Buyer in pursuing the Phase II Approvals, not to exceed $60,000. . . . If the Approvals with respect to the Phase II Closing are not obtained prior to the expiration of the Phase II Approvals Extension Period, then Buyer may, in its sole and absolute discretion, terminate this Contract in its entirety and receive a refund of the unapplied portion of the Earnest Money, subject to delivery of the Release, as hereinafter defined, or waive such Primary Contingencies and proceed to the Phase II Closing.

Compl., Ex. B § 1(f)(b).

from Seller for the default shall not exceed Sixty Thousand and No/100 Dollars ($60,000.00) for each Phase for which a Closing has not already occurred. Notwithstanding the foregoing or anything herein to the contrary, in the event specific performance is not available as a remedy as result of actions taken by Seller, then Buyer may exercise all remedies available at law or in equity.

Agt. § 15(b).

**B.    Horton Contends The Primary Contingencies Are Not Satisfied And Refuses To Close on Phase II Without Extending The Phase II Outside Closing Date.**

On May 3, 2022, Horton and Bunting Macks closed on Phase I. Compl. ¶ 17. Horton alleges that after the Phase I closing, it "discover[ed] . . . that Bunting Macks had not met all of the Primary Contingencies contained in the Agreement," "causing Horton significant delays and increased costs in developing Phase I." *Id*. ¶ 18.

The Agreement initially set the Phase II Closing Date for May 3, 2023, the one-year anniversary of the Phase I closing. *Id*. ¶ 21. Bunting Macks extended the Phase II Closing Date five times. *Id*. On August 1, 2023, Bunting Macks sent its fifth extension notice to Horton, extending the Phase II Closing Date to October 3, 2023. *Id*. ¶ 22 (citing Ex. C). The notice informed Horton that Bunting Macks anticipated receiving all Approvals for Phase II on or before August 31, 2023. *Id*.

On August 16, 2023, Horton sent a letter to Bunting Macks disputing that all Approvals for Phase II would be obtained by August 31, 2023. *Id*. ¶ 23 (citing Ex. D). Horton advised that it "ha[d] not yet made a decision as to what it w[ould] elect to do when the Primary Contingencies are not satisfied by the required deadline" and

"reserve[d] all rights and remedies it may have under the Agreement, including the right to take over the Approvals process as outlined in the Agreement." Compl., Ex. D at 6. On August 18, 2023, Bunting Macks responded that all Primary Contingencies for Phase II had been satisfied. Compl. ¶ 25 (citing Ex. E).

Thereafter, Horton and Bunting Macks agreed to a tolling period for performance and notices under the Agreement. *Id*. ¶ 26. The tolling period ran for seventy-six days, from August 31 to November 15, 2023. *See id*., Ex. F at 4. When the tolling period expired on November 15, 2023, Bunting Macks noticed the Phase II closing to occur on December 19, 2023. Compl. ¶ 29; *see also id*., Ex. G at 1-2; Agt. § 6(e).

On December 4, 2023, Horton sent a default notice to Bunting Macks, asserting that Horton had breached the Agreement by, among other things, failing "to diligently and in good faith seek the Approvals for Phase II" as required under Section 5(f) and "encumbering the Property with an interconnection to Seller's adjacent parcel" in breach of Sections 13(a) and 17 of the Agreement. Compl. ¶ 36; *see also id*., Ex. I at 2.

On December 20, 2023, Bunting Macks sent a default notice to Horton based on Horton's failure to attend the Phase II closing on December 19, 2023. Ans. Of Bunting Macks LLC And Roxana Road LLC To Pl.'s Compl. With Affirm. Defenses And Countercl., Ex. 11, Dkt. 5. Horton did not close on its purchase of Phase II

6

within the 45-day cure period provided in the Agreement,[2] nor did it deliver a Phase II Approvals Election Notice to extend the Phase II Outside Closing Date. *Id.*

## C.     Horton Files Suit Seeking Specific Performance.

On January 29, 2024, Horton initiated this action through the filing of a verified complaint (the "Complaint"). Dkt. 1. The Complaint alleges that Bunting Macks breached the Agreement by "fail[ing] completely to pursue almost any of the contractually required [A]pprovals," including "DelDOT entrance permits, DelDOT offsite approvals, stamped approved plans from the Town of Selbyville, DNREC approvals, and Sussex Conservation District Approvals." Compl. ¶ 7. The Complaint further alleges that the Approvals Bunting Macks pursued "were not even consistent with what the Agreement requires." *Id.* ¶ 3. According to the Complaint, "the plans that Bunting Macks submitted for approval of Phase II of Coastal Villages do not contain the correct number of lots or lot dimensions, and, contrary to the requirements of the Agreement, spill on to land reserved for a later Phase of the development." *Id.* ¶ 4. In addition, the Complaint alleges that "the plans encumber Phase II with an interconnection . . . to a neighboring property being developed by Bunting Macks' affiliate," Roxana Road LLC ("Roxana"), and "show a pump station and accompanying force main . . . far larger than needed for Coastal Villages, with

---

[2] *See* Agt. § 15(d) (providing for notice and forty-five-day cure period).

7

the intent to benefit the neighboring Roxana Road development, without compensation to Horton." *Id*. ¶¶ 5-6.

The Complaint asserts five counts. Count I alleges a claim for breach of contract premised on allegations that Bunting Macks "pursu[ed] the wrong development plan and [did] not pursu[e] at all any of the other contractually required approvals, and . . . encumber[ed] the Property with the Interconnection and a Pump Station System design that is larger and costlier than required for the sole benefit of Roxana Road." *Id*. ¶ 51. Count II "seeks specific performance of the Agreement, requiring that Bunting Macks be required to cure its defaults and perform its obligations under the Agreement with respect to obtaining all contractually required approvals, including, without limitation[,] the satisfaction of any outstanding Primary Contingencies," as well as an "injunction preventing Bunting Macks from processing plans for the Pump Station System . . . ." *Id*. ¶¶ 56, 60. Count III alleges a claim for unjust enrichment; Count IV alleges a claim against Roxana for tortious interference with contract; and Count V seeks various declarations arising from Horton's other counts. *Id*. ¶¶ 62-82.

On February 6, 2024, Defendants answered the complaint and asserted counterclaims. Dkt. 5.

On March 27, 2024, Defendants moved for partial judgment on the pleadings (the "Motion") and filed their opening brief in support thereof. *See* Defs.' Op. Br.

8

In Supp. Of Their Mot. For Partial J. On The Pleadings Concerning Approvals [hereinafter, "OB"], Dkt. 31. On April 30, 2024, Horton filed an answering brief in opposition to the Motion. *See* Pl.'s Ans. Br. In Opp'n To Defs.' Mot. For Partial J. On The Pleadings Concerning Approvals [hereinafter, "AB"], Dkt. 39. On May 14, 2024, Defendants filed a reply brief in further support of the Motion. *See* Defs.' Reply Br. In Further Supp. Of Their Mot. For Partial J. On The Pleadings Concerning Approvals [hereinafter, "RB"], Dkt. 47. The Court heard oral argument on the Motion on May 29, 2024. Dkt. 51.

## II. ANALYSIS

### A. Standard of Review

"This court will grant a motion for judgment on the pleadings pursuant to Rule 12(c) when there are no material issues of fact and the movant is entitled to judgment as a matter of law." *Menna v. Weidhaas*, 2023 WL 4851547, at *6 (Del. Ch. July 28, 2023) (internal quotation marks omitted) (quoting *Lillis v. AT & T Corp.*, 904 A.2d 325, 329 (Del. Ch. 2006)). "[J]udgment on the pleadings . . . is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact." *Id.* (alteration and ellipsis in original) (citation omitted).

Through the Motion, Bunting Macks seeks a "partial judgment on the pleadings on Plaintiff's claims that are based upon Plaintiff's allegations that Approvals for Phase II were not obtained." Dkt. 31. Bunting Macks asks the Court

9

to dismiss bits and pieces of Counts I, II, and V and to trim remedies sought in the Complaint's Prayer for Relief.[3] This final report declines to prune the thicket of Horton's pled claims,[4] but addresses a key issue raised in the Motion—namely, the availability of specific performance under the plain terms of the Agreement.

At the pleadings stage, a party seeking specific performance must allege facts from which "it is reasonably conceivable that [it] could establish a right to specific performance by clear and convincing evidence." *Pulieri v. Boardwalk Props., LLC*, 2015 WL 691449, at *5 (Del. Ch. Feb. 18, 2015).

---

[3] *See* [Proposed] Order Granting Defs.' Mot. For Partial J. On The Pleadings Concerning Approvals ¶ 2, Dkt. 31 (seeking judgment in Defendants' favor on the following: (1) "Count I of Horton's Complaint, to the extent it is based on Horton's claim that 'Bunting Macks has breached the Agreement by pursuing the wrong development plan and not pursuing at all any of the other contractually required approvals'"; (2) "Count II of Horton's Complaint, to the extent that 'Horton seeks specific performance of the Agreement, requiring that Bunting Macks be required to cure its defaults and perform its obligations under the Agreement with respect to obtaining all contractually required approvals, including, without limitation, the satisfaction of any outstanding Primary Contingencies'"; (3) "Count V of Horton's Complaint, to the extent that Horton seeks a declaration that 'the Agreement requires Bunting Macks to deliver Phase II with full development approvals (including DelDOT approvals) to develop Phase II of the Property in accordance with the plat plan attached to the Agreement; [and] that Bunting Macks has failed to do so'"; and (4) "Prayer ¶ B of Horton's Complaint, to the extent that Horton seeks 'permanent injunctive relief requiring Bunting Macks to . . . sell[] the Property to Horton with all . . . contingencies . . . met and with all contractually required approvals.'" (first quoting Compl. ¶ 51; then quoting Compl. ¶ 56; then quoting Compl. ¶ 82(2); and then quoting Compl. Prayer ¶ B)).

[4] *See inVentiv Health Clinical, LLC v. Odonate Therapeutics, Inc.*, 2021 WL 252823, at *4 (Del. Super. Jan. 26, 2021) ("[A]t the pleading stage of a case, a trial judge is not a robed gardener employing Rule 12(b)(6) as a judicial shear to prune individual theories from an otherwise healthily pled claim or counterclaim.").

**B.      Specific Performance Is Not Available Under The Agreement.**

Bunting Macks' primary argument in support of the Motion is that the passing of the Phase II Outside Closing Date, as defined in Section 6(b) of the Agreement, forecloses Horton's request for specific performance.

Section 18(b) provides that "time is of the essence in . . . the performance of all obligations hereunder[,]" and Section 6(b) imposes a clear deadline—the Phase II Outside Closing Date—by which the transaction "shall" close.  *See* Agt. § 18(b); *id*. § 6(b).  That language creates a condition subsequent, such that if closing does not occur by the Phase II Outside Closing Date, then the parties' obligations to close are extinguished.[5]  The parties did not close by the Phase II Outside Closing Date, and Horton did not exercise its right to extend it.[6]  As Bunting Macks argues, by waiting until after the Phase II Outside Closing Date to seek relief, Horton "is asking the Court to rewrite the contract by extending the closing deadline," even though "[t]he parties did not bargain for [such] an extension . . . ."  *Appleby Apartments LP*

---

[5] This Court has explained that

> [w]here the parties have created a condition precedent, the occurrence of that condition is necessary to give rise to the other party's duty to perform; if the condition does not occur, the duty never arises.  A condition subsequent is an event that discharges a party from a preexisting duty to perform immediately; the occurrence of the condition extinguishes that duty.

*Ainslie v. Cantor Fitzgerald, L.P.*, 2023 WL 106924, at *10 (Del. Ch. Jan. 4, 2023) (internal footnotes omitted), *rev'd on other grounds*, 312 A.3d 674 (Del. 2024).

[6] *See* Compl. ¶ 26 ("[T]he outside closing date has passed . . . .").

11

*v. Appleby Apartments Assocs*., L.P., 2023 WL 5620830, at \*5 (Del. Ch. Aug. 30, 2023) (overruling exceptions to a Magistrate in Chancery's final report denying a request for specific performance on the pleadings).[7]

Horton counters that the passing of the Phase II Outside Closing Date does not foreclose specific performance for two reasons: (1) the Agreement does not provide that time is of the essence, and (2) Bunting Macks was in breach of the Agreement when the Phase II Outside Closing Date passed.  As explained below, both arguments fail.

### 1. The Agreement Provides That Time Is Of The Essence.

Horton argues that "Defendants overstate the force of the time is of the essence clause" because "[u]nder Delaware law, the specific dates included in a real estate sales contract are, at best, good faith estimates, and courts will allow a reasonable amount of additional time for the parties to perform their obligations, in order to effectuate the purpose and intent of the Agreement."  AB at 31-32.  But as the authority on which Horton relies makes clear, Delaware courts enforce strict deadlines in contracts, including real estate agreements, where the parties have

---

[7] *Cf. Roma Landmark Theaters, LLC v. Cohen Exhibition Co. LLC*, 2020 WL 5816759, at \*9 (Del. Ch. Sept. 30, 2020) ("Having agreed to [certain] terms, Buyer cannot create new free-floating contractual protections that it did not bargain for . . . ."); *GRT, Inc. v. Marathon GTF Tech., Ltd*., 2012 WL 2356489, at \*6 (Del. Ch. June 21, 2012) ("Under Delaware law, courts will not rewrite contracts to read in terms that a sophisticated party could have, but did not, obtain at the bargaining table.").

agreed that time is of the essence. *See Cornell Glasgow, LLC v. LaGrange Props., LLC*, 2012 WL 6840625, at \*11 (Del. Super. Dec. 7, 2012) (explaining that a time is of the essence provision means "that exact compliance with the terms of the contract in this respect is essential to the right to require counter-performance" (quoting 15 Williston on Contracts § 462 (4th 2000))).[8]

Horton notes that the Agreement does not make "the specific date of the closing" "static[,]"[9] but this argument misses the point. The parties agreed that "[t]ime is of the essence in the occurrence of all events, the satisfaction of all conditions and the performance of all obligations hereunder[,]" and negotiated a mechanism setting an outside date by which the transaction "shall" close. *See* Agt.

---

[8] *Compare Lewes Inv. Co. v. Est. of Graves*, 2013 WL 508486, at \*14 (Del. Ch.) ("*If the contract does not expressly say time is of the essence*, 'settlement dates in contracts without this language [are], at best, good faith estimates of when the transaction will be consummated.'" (emphasis added) (citation omitted)), *aff'd*, 74 A.3d 654 (Del. 2013); *Walton v. Beale*, 2006 WL 265489, at \*6 (Del. Ch.) ("Generally time is not of the essence in a contract for the sale of land and will not be deemed of the essence *unless it is specifically stated in the contract*." (emphasis added)), *aff'd*, 913 A.2d 569 (Del. 2006); *Bryan v. Moore*, 863 A.2d 258, 261 (Del. Ch. 2004) (allowing a "reasonable time" to perform under the contract where "the words 'time is of the essence' [we]re not in the contract and [could not] reasonably be inferred by the language used"), *with Morris v. Delmarva Real Est. Hldgs., LLC*, 2024 WL 413512, at \*7 (Del. Ch. Feb. 5, 2024) (enforcing a firm deadline in a purchase option agreement where time was of the essence); *Peden v. Gray*, 886 A.2d 1278, 2005 WL 2622746, at \*2-4 (Del. 2005) (TABLE) (affirming denial of a buyer's request for specific performance where the real estate contract contained a time is of the essence clause and the closing date had passed).

[9] AB at 32; *see also id*. ("[T]he closing date of each previous Phase can vary by as much as nearly a year depending on how many extension options are exercised, and whether Horton elects its option under Section 6 to pursue the Approvals itself.").

§ 18(b); *see also id*. § 6(b).  The extension options available through that mechanism do not change that fact.  Horton's argument fails in light of the plain language of the Agreement.

**2.**     **The Complaint Fails To Plead That Bunting Macks' Alleged Breaches Contributed Materially To The Passing Of The Phase II Outside Closing Date.**

Horton also contends that the passing of the Phase II Outside Closing Date does not foreclose specific performance because Bunting Macks breached the Agreement.  Horton raises this argument in a single sentence of its brief, asserting that "it is reasonably conceivable based on the allegations in the Complaint that the Court could find Bunting Macks prevented Horton from closing by deliberately seeking incorrect approvals that encumbered the Property, and that Horton is therefore entitled to specific performance of the Agreement."  AB at 26.  Horton cites no contractual or doctrinal support for this contention, but read charitably, it appears to reference the prevention doctrine.

"The prevention doctrine provides that 'where a party's breach by nonperformance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused.'"  *Snow Phipps Gp., LLC v. Kcake Acq.,*

*Inc.*, 2021 WL 1714202, at *52 (Del. Ch. Apr. 30, 2021) (citation omitted).[10]  The prevention doctrine is an awkward fit here.  Although Horton alleges that Bunting Macks breached the Agreement by failing to diligently and in good faith seek the Approvals and encumbering the Property,[11] Bunting Macks does not rely on the non-occurrence of a condition precedent to avoid any obligation under the Agreement.  The condition precedent in dispute—receipt of Approvals—is a condition to Horton's, not Bunting Macks', obligation to close.  *See* Compl., Ex. B § (1)(f)(b).  Bunting Macks has not cited, nor could it cite, the failure to obtain Approvals as a basis for avoiding its obligation to close under the Agreement.

---

[10] *See also, e.g.*, *Murphy Marine Servs. of Del., Inc. v. GT USA Wilm., LLC*, 2022 WL 4296495, at *1 (Del. Ch. Sept. 19, 2022) ("To the extent that KPMG finalizing its work was a condition precedent to [the defendant]'s performance, its failure is excused under the prevention doctrine."); *Snow Phipps*, 2021 WL 1714202, at *55 ("[U]nder the prevention doctrine, [the defendant] is barred from asserting the absence of Debt Financing as a basis to avoid specific performance under Section 11.14(b) . . . ."); *Mobile Commc'ns Corp. of Am. v. Mci Commc'ns Corp*, 1985 WL 11574, at *4 (Del. Ch. Aug. 27, 1985) ("The 'prevention doctrine' provides that a party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent." (citation omitted)); *but see Neurvana Med., LLC v. Balt USA, LLC*, 2020 WL 949917, at *19 (Del. Ch. Feb. 27, 2020) (at the pleading stage, rejecting the argument that "the prevention doctrine applies because [the defendant]'s supposed breaches impeded the conditions that would have triggered the milestone payments").

[11] *See* AB at 27 ("Bunting Macks's breach with respect to the Approvals is the intentional failure to pursue what is required by the Agreement, not in the absolute failure to obtain Approvals.").

Instead, Bunting Macks cites the occurrence of a condition subsequent—the passing of the Phase II Outside Closing Date—as extinguishing the parties' obligations to close. Assuming breach can excuse the occurrence of such a condition,[12] the Complaint nevertheless does not plead facts supporting a reasonably conceivable inference that Bunting Macks' alleged breaches contributed materially to the passing of the Phase II Outside Closing Date. That is because none of Bunting Macks' alleged breaches caused the Phase II Outside Closing Date to pass—rather, Horton's choice not to extend the Phase II Outside Closing Date did.

Under Section 6(b), the parties expressly contemplated the possibility that Bunting Macks would not receive the Approvals by the Phase II Outside Closing Date. Compl., Ex. B § 1(f)(b). In that case, the contract provided Horton with three

---

[12] The parties have not briefed, so I do not address, whether a party's breach could in fact excuse the passing of a carefully negotiated outside closing date where, as here, the non-breaching party waited to assert its rights until after the outside date passed. *But see, e.g.*, *Akorn, Inc. v. Fresenius Kabi AG*, C.A. No. 2018-0300-JTL, at 32:18-24 (Del. Ch. May 2, 2018) (TRANSCRIPT) (granting motion to expedite and explaining that "on a preliminary read . . . if [the plaintiff] proved and I found that [defendant] had . . . failed to perform [its] obligations under the agreement and, hence, w[as] a principal cause of the failure to close, then [defendant] would be held under the agreement, notwithstanding the outside date."); *Walton*, 2006 WL 265489, at *6 ("If . . . the defendants' actions cause the plaintiff to fail to meet the contractual settlement date, the plaintiff will not be held liable for the breach induced by the defendants."); *cf. Vintage Rodeo Parent, LLC v. Rent-a-Ctr., Inc.*, 2019 WL 1223026, at *21 (Del. Ch. Mar. 14, 2019) ("For [the defendant] to lose its right to terminate under Section 8.01(b)(i), its breach must be one that causes a failure to consummate the Merger by the End Date. . . . Even had the Plaintiffs demonstrated a breach of commercially reasonable efforts inhering in [the defendant's] failure to warn, they have, nonetheless, not shown that such a breach prevented consummation of the Merger by the End Date.").

16

options: Horton could (1) terminate the Agreement and receive a refund of the remaining unapplied portion of the Earnest Money, (2) waive the Primary Contingencies (including the Approval condition) and proceed to closing, or (3) extend the Phase II Outside Closing Date by delivering a Phase II Approvals Election Notice prior to the Phase II Closing Date and pursue the Approvals itself. *Id*.

Horton argues, unconvincingly, that it was not permitted to extend the Phase II Outside Closing Date to pursue the Approvals. Section 6(b) states that "[i]f Seller, *despite Seller's good faith efforts*, has not obtained the Approvals with respect to Phase II at least thirty (30) days prior to the Phase II Outside Closing Date, then Buyer may, upon written notice to Seller delivered prior to the Phase II Outside Closing Date . . . , elect to pursue receipt of the Approvals . . . ." Compl., Ex. B § 1(f)(b) (emphasis added). Horton suggests that because Bunting Macks did not make "good faith efforts" to obtain Approvals, this option was unavailable to Horton. AB at 28. In other words, Horton interprets this language to mean that Horton could extend the Phase II Outside Closing Date to pursue the Approvals *only if* Bunting Macks first made good faith efforts to obtain them. That interpretation is nonsensical; Horton offers no explanation for why the parties might have agreed to foreclose Horton's option to extend the Phase II Outside Closing Date in the event

17

Bunting Macks failed to use good faith efforts.[13] The only reasonable reading of Section 6(b) is that, *notwithstanding* (or irrespective of) Bunting Macks' good faith efforts, Horton could elect to extend the Phase II Outside Closing Date to pursue receipt of the Approvals itself.

Although Horton could have extended the Phase II Outside Closing Date, it chose not to do so. As the deadline approached, Horton told Bunting Macks that it "ha[d] not yet made a decision as to what it w[ould]elect to do[,]" while purporting to "reserve[] all rights and remedies it may have under the Agreement, including the right to take over the Approvals process as outlined in the Agreement." Compl., Ex. D at 6. Horton then chose not to extend the Phase II Outside Closing Date, waited more than a month, then filed the Complaint seeking an order of specific performance to extend the parties' obligations under the Agreement indefinitely— an extension for which the parties did not bargain. Horton's choice not to extend the Phase II Outside Closing Date had consequences—namely, that with the passing of the Phase II Outside Closing Date, Horton lost its ability to compel Bunting Macks to close. *See Appleby Apartments LP*, 2023 WL 5620830, at *4 ("[The plaintiff] admittedly opted not to proceed. That choice had a consequence." (footnote

_____

[13] *See* RB at 26 ("Under Horton's interpretation, Horton could not take over the Approvals process in precisely the situation when Horton would naturally want to take it over the most, where it believed that Bunting Macks was not making good faith efforts to seek the Approvals.").

18

omitted)); *Realogy Hldgs. Corp. v. SIRVA Worldwide*, 2020 WL 4559519, at \*6 (Del. Ch. Aug. 7, 2020) (declining to "reach the abstract or doctrinal boundaries of the prevention doctrine because . . . [the plaintiff], and not [the defendant], caused the conditions to fail by filing the Non-Retained Claims").[14]

Horton argues that it "was not required to exercise the option for the 'Phase II Approvals Extension Period'" because "the option to extend the Outside Closing Date" "was at the discretion of Horton and Horton alone." AB at 25. That is true; yet Horton's decision not to extend the Phase II Outside Closing Date also has consequences under the plain language of the Agreement. Separately, Horton argues that Bunting Macks' alleged breaches of Sections 13(a) and 17 provide an independent basis to order specific performance,[15] but it does not explain how such breaches prevented Horton from extending the Phase II Outside Closing Date. And while Horton contends that extending the Phase II Outside Closing Date would have

---

[14] *Cf. Georgetown Crossing LLC v. Ruhl*, 2006 WL 4782273, at \*12 (Del. Ch. Dec. 5, 2006) (denying a purchaser's request for specific performance of a land sale agreement where its decision to terminate the agreement prior to closing had consequences under the agreement—namely, foreclosing "its right to insist upon closing").

[15] *See* AB at 6 (claiming that "[t]he Court . . . cannot 'refuse [as a matter of law] Horton's request [to] extend the Phase II Outside Closing Date' without resolving these other aspects of Horton's breach claim" concerning the encumbrance of the Property "with an Interconnection and enlarged Pump Station System").

been "futile"[16] due to Bunting Macks' alleged breaches of Sections 13(a) and 17, Horton has no answer for why it could not have extended the Phase II Outside Closing Date and also sought specific performance of Bunting Macks' outstanding obligations.

For these reasons, as a matter of law, specific performance is not available under the Agreement.

## III. CONCLUSION

For the reasons explained above, the Complaint does not plead facts supporting a reasonably conceivable inference that an order of specific performance is available under the terms of the Agreement.

Within fourteen days, the parties shall submit supplemental memoranda, not to exceed 8,000 words, addressing the basis (if any) for the Court's continuing subject matter jurisdiction over the remaining issues in this action. Exceptions to this final report are stayed under Court of Chancery Rule 144(f) pending a ruling on subject matter jurisdiction.

---

[16] *See id.* ("Horton could not and cannot remedy the[] [encumbrances] simply by electing to extend the outside closing date and obtaining the remaining Approvals itself because the[] breaches result from Bunting Macks encumbering the property separate and apart from Bunting Macks's failure to pursue the contractually required Approvals.").